(No. 80130.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JOHN R. SANDHAM, Appellant.

*Opinion filed November 21, 1996.*

Daniel D. Yuhas, Deputy Defender, and Duane E. Schuster, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield,

and Thomas J. Brown, State's Attorney, of Pontiac (Barbara E. Preiner, Solicitor General, and Arleen C. Anderson and Bridget L. Field, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

Defendant, John R. Sandham, was convicted after a bench trial in the circuit court of Livingston County of one count of aggravated criminal sexual abuse (720 ILCS 5/12—16 (West 1992)) and sentenced to a five-year term of imprisonment. The appellate court affirmed (276 Ill. App. 3d 86), and this court subsequently granted defendant's petition for leave to appeal (155 Ill. 2d R. 315). Defendant argues before this court that his conviction must be reversed and a new trial ordered because (1) the trial court failed to secure defendant's written jury waiver and his oral waiver was not made understandingly; (2) the trial court failed to conduct a fitness hearing when a *bona fide* doubt as to defendant's fitness arose and when evidence was elicited that defendant may have been taking psychotropic medication; (3) hearsay evidence was improperly admitted; and (4) the evidence was insufficient to find defendant guilty beyond a reasonable doubt. For the reasons expressed below, we reverse defendant's conviction and remand for a new trial based upon our determination that a *bona fide* doubt as to defendant's fitness arose following which no fitness hearing was held. Accordingly, we do not reach defendant's remaining arguments.

In deciding this cause, we recount only those facts necessary to disposing of the issues raised in this appeal.

## I. Fitness of Defendant

Defendant's dual contentions regarding his fitness to stand trial are: (1) that a *bona fide* doubt regarding his

fitness arose which required the trial court to, *sua sponte*, conduct a fitness hearing pursuant to section 104—11 of the Code of Criminal Procedure (725 ILCS 5/104—11 (West 1992)); and (2) that evidence of his ingestion of psychotropic medications at or about the time of trial required the court to conduct a fitness hearing pursuant to section 104—21(a) of the Code (725 ILCS 5/104—21(a) (West 1992)). Insofar as the trial court never held a fitness hearing, defendant contends that his conviction must be reversed. The State counters that defendant has waived his fitness arguments by failing to raise them either at trial or in his post-trial motions. The right to be fit for trial, however, is fundamental. *People v. Eddmonds*, 143 Ill. 2d 501, 512-13 (1991). Accordingly, prosecuting a defendant where there is a *bona fide* doubt as to that defendant's fitness renders the proceeding fundamentally unfair and we review this contention under the plain error rule. 134 Ill. 2d R. 615(a).

Due process bars prosecuting or sentencing a defendant who is not competent to stand trial. *Eddmonds*, 143 Ill. 2d at 512-13. Fitness to stand trial requires that a defendant understand the nature and purpose of the proceedings against him and be able to assist in his defense. 725 ILCS 5/104—10 (West 1992). Although a defendant's fitness is presumed by statute (725 ILCS 5/104—10 (West 1992)), the circuit court has a duty to order a fitness hearing, *sua sponte*, any time a *bona fide* doubt arises regarding a defendant's ability to understand the nature and purpose of the proceedings or assist in his defense. Whether a *bona fide* doubt as to a defendant's fitness has arisen is generally a matter within the discretion of the trial court. *People v. Murphy*, 72 Ill. 2d 421, 431 (1978).

Here, defense counsel never requested a fitness hearing pursuant to section 104—11 of the Code and defen-

dant maintains that the trial court abused its discretion in not recognizing, *sua sponte*, that a *bona fide* doubt as to defendant's fitness existed. In support defendant points to various portions of the record which he claims raised a *bona fide* doubt as to his fitness prior to trial or, in the alternative, prior to sentencing.

The first suggestion that there may have been a *bona fide* doubt as to defendant's fitness occurred on April 22, 1993, when defendant's public defender made an oral motion to the court requesting permission to engage a psychiatrist to determine whether defendant was fit to stand trial. The court granted leave and instructed defense counsel to prepare a written motion and proposed order to that effect. However, on that same date a private attorney appeared and was substituted as counsel for defendant. Once the public defender was discharged, the psychiatric evaluation motion that had been orally allowed by the judge was never referred to or acted upon by the newly retained counsel. The record provides no explanation for this.

The case was subsequently set for a bench trial on May 28, 1993. However, on May 14, 1993, less than one month after the public defender's request to engage a psychiatrist, another event indicating that there was a *bona fide* doubt as to defendant's fitness occurred. On that date, defense counsel filed a motion to continue the trial indefinitely because defendant had been unable to cooperate with defense counsel except with difficulty up through May 4, 1993, and because defendant had been committed to the BroMenn psychiatric ward. The court granted the motion and reset the trial for July 16, 1993, which was later continued to September 13, 1993. The record is silent as to the purpose, duration or treatment provided defendant in the psychiatric ward.

Not silent, however, was the defendant. On March 30, 1993, and July 8, 1993, defendant sent separate let-

ters to the trial judge, both of which defendant argues evidence a *bona fide* doubt as to his fitness. The March 30 letter, which preceded the public defender's request for a psychiatric evaluation, asked the court to "give me 14 years straight time. No good time or supplemental. 14 straight years. *Then I can proceed with my real life and have no regrets about ending this one.*" (Emphasis added.) While the defendant's reference to his "real life" may have been odd, the letter was respectful in tone. This is in marked contrast to the letter of July 8, 1993, which was written after defendant's commitment to the BroMenn psychiatric ward. The July 8 letter was exceedingly hostile and profane, describing in explicit terms the sexual aggressions defendant associated with prison life. It further explained, rather incoherently, that the judge sends "innocents" such as defendant to prison whereupon the judge collects his paycheck and absolves this sin at the Lutheran church on Sundays. The letter then curses the judge using a variety of expletives and laments that defendant will be the next person to go to prison because the judge does not use his position and power to stop it. In a similar vein, we observe the judge's statement in the record that defendant also made several threatening phone calls to him during the time period defendant was writing these letters.

Defendant was eventually discharged from the psychiatric ward, whereupon a bench trial followed and defendant was convicted of aggravated criminal sexual abuse (720 ILCS 5/12—16 (West 1992)). Defendant argues that during the ensuing March 1, 1994, sentencing hearing, additional testimony transpired which raised a *bona fide* doubt as to defendant's fitness. First defendant notes the testimony of the complainant's mother, who testified that she knew the defendant personally and that the defendant, "wasn't all the way there *** [that there] would be days he would be okay,

but there would be other days he'd run outside and start praying to God real loud. \*\*\* There was times he never did act normal."

Defendant next refers this court to his father's testimony at the sentencing hearing regarding the Carl Pfeiffer Treatment Center's psychological evaluation of defendant, which was conducted prior to the sentencing hearing. Though the trial court was provided a copy of and considered the evaluation at the sentencing hearing, the evaluation is not contained in the record. We thus consider only those references to the evaluation found in the record.

Defendant's father testified that the evaluation suggested that defendant had a slight chemical imbalance and that defendant had a slight case of schizophrenia. The Pfeiffer Center recommended a three-month treatment regimen after which defendant would be reevaluated. Part of the difficulty in evaluating defendant, according to defendant's father, was the medication prescribed to defendant at the Menard Correctional Center psychiatric ward, which included the psychotropic drugs lithium, Prolixin and Ativan.

Finally, defendant refers this court to the colloquy between the defendant, trial court and defense counsel at the close of the sentencing hearing. After the State requested a maximum nonextended term sentence, defense counsel pleaded with the court to sentence defendant to probation and psychological treatment instead of prison time. This plea was interrupted by defendant, who stated, "Cut my brain out. You'll be sorry, and I won't do nothing. I'll be brain dead." Defense counsel then observed for the court that "you can tell from the way he talks that this is something that we need to address.",The court then ascertained from defense counsel that defendant was currently taking the prescribed psychotropic medication, after which the de-

fendant stated, "I've already got my brain cut apart spiritually. Do you know what I mean? I know what I mean." The trial court then recessed for 15 minutes to read the presentence report.

Upon returning to the bench, the judge detailed why he found the defendant guilty and then stated as follows, with periodic interruptions from the defendant:

"THE COURT: The issue I have now is whether you are competent to proceed with sentencing, whether you are capable of participating in this. *You don't even seem to understand what's going on. You are making comments that are obviously inappropriate.* \*\*\* *I don't fully understand the nature of mental illness. I don't think anyone does—even psychiatrists and psychologists.*

The one thing I do know and am concerned about [is] that since '90 things have gotten progressively worse \*\*\* since getting out of prison \*\*\* he's been convicted of disorderly conduct, trespass, retail theft, and also been up on sentencing for trespass to real property.

*There are various reasons for sentencing, John. Whether you understand what I'm saying or not I am not sure;* but the important factors are doing things that could rehabilitate you. I don't know what that is. \*\*\*

But although on the one hand sentences are many times to try to rehabilitate people, and on the other hand they are for society's protection, I'm trying to look at it from both sides.

DEFENDANT: *I don't see any way to protect me from this society.* \*\*\*

THE COURT: Considering all the evidence at trial [and] the presentence report which is very thorough, I am going to sentence you, John, with credit for time served to five years in the Department of Corrections. I feel that's appropriate; and on the misdemeanor, I'll just sentence you to—

DEFENDANT: *I talked to my mother.*

THE COURT: Credit for time served. You'll be eligible in all likelihood to get out—

DEFENDANT: You don't know a lie from the truth because you are sending me up, and I didn't do anything. \*\*\*

THE COURT: \*\*\* Am I here to help [defendant], protect society or both? \*\*\* *I'm not disagreeing that sending a person to prison with mental health problems is [not] going to help him. It might; it might not.* \*\*\*

Also a concern I have is the protection of the public. \*\*\*

DEFENDANT: *I've got three albums on the top of the charts and comic books all over."* (Emphasis added.)

Defendant argues that his comments at sentencing were so unrelated to the proceedings at hand that they raised . a *bona fide* doubt as to defendant's fitness. Moreover, defendant contends that even the trial judge realized this when he stated that defendant did not seem to know what was going on and that he did not know whether defendant even understood what the trial judge was saying.

The State counters each of defendant's individual suggestions of unfitness with a specific case holding that a similar circumstance did not raise a *bona fide* doubt as to fitness. See *People v. Eddmonds,* 143 Ill. 2d 501, 519 (1991) (assertion by counsel of defendant's unfitness does not, in and of itself, create *bona fide* doubt); *People v. Skorusa,* 55 Ill. 2d 577, 582 (1973) (granting defense counsel's request for a psychiatric examination does not raise a *bona fide* doubt); *People v. Smith,* 253 Ill. App. 3d 948, 954 (1993) (hostile behavior on the part of defendant not necessarily reflective of a person utterly out of control or incapable of understanding the charges against him). The State further argues that each of defendant's letters is capable of a construction that does not raise a *bona fide* doubt as to defendant's fitness and argues likewise regarding the various irrational statements made by the defendant at his sentencing hearing. Accordingly, the State asks this court to conclude that the trial court did not abuse its discretion in not determining that there was a *bona fide* doubt as to defendant's fitness. This, however, we cannot do.

Summarized briefly, the trial court was aware of the following episodes and testimony relating to the issue of whether there was a *bona fide* doubt as to defendant's fitness: (1) the public defender's oral motion, which the trial court granted, to obtain a psychiatric evaluation to determine defendant's fitness; (2) the continuance of the trial due to defendant's inability to cooperate with defense counsel except with difficulty and the defendant's ensuing commitment to a psychiatric ward; (3) defendant's two letters to the court which were complimentary and exceedingly hostile, respectively, and which spoke of defendant beginning his "real life" after sentencing; (4) defendant's threatening phone calls to the trial judge; (5) the testimony of complainant's mother that defendant was not "all the way there" and would sometimes run outside and start praying loudly to God; (6) the Pfeiffer Center evaluation testimony which suggested that defendant had a slight chemical imbalance and was slightly schizophrenic; (7) defendant's ingestion of psychotropic medications at or about the time of trial and/or sentencing; and (8) defendant's irrational outbursts during the sentencing hearing regarding his brain being cut out, his conversation with his mother, his "top of the charts" albums and his comic books.

The State's attempt to explain away the individual episodes and testimony detailed above, as if each occurred in a vacuum, cannot be countenanced. As a reviewing court, we will not ignore the impact of these events and testimony when considered in relation to each other and the record as a whole. The State does not, and indeed cannot, cite to precedent holding that so many and varied suggestions that a defendant might be unfit did not raise a *bona fide* doubt as to the defendant's fitness.

While it is correct that a defendant may be compe-

tent to stand trial even though his mind is otherwise unsound and that some doubt as to a defendant's fitness is not necessarily enough to warrant a fitness hearing (*Eddmonds*, 143 Ill. 2d at 513, 519), a trial court's discretion in so concluding is not unbridled. We hold that the trial court abused its discretion in not ruling, *sua sponte*, that the instant events and testimony combined to raise a *bona fide* doubt as to defendant's fitness to stand trial or be sentenced. Indeed, we observe that the trial judge himself appears to have recognized a *bona fide* doubt regarding defendant's fitness when he stated that defendant "[did not] even seem to understand what's going on" and "whether you understand what I am saying or not I am not sure." While it could well be argued that a *bona fide* doubt as to defendant's fitness arose prior to these observations, there is no question that the trial judge had no discretion and was required to conduct, *sua sponte*, a fitness hearing at the point he questioned defendant's capacity to comprehend what was transpiring at the sentencing hearing. 725 ILCS 5/104—11 (West 1992). This the court did not do.

We note that all the events and testimony cited by the defendant, including those occurring during the sentencing hearing, are relevant to defendant's fitness at the time of trial. We thus hold that the court's failure to conduct a fitness hearing pursuant to section 104—11 requires that defendant's conviction be vacated and the cause remanded for a new trial. Only in this manner can it be ensured that defendant was not convicted in violation of the due process clause of the fourteenth amendment (U.S. Const., amend. XIV), which provides that a defendant is unfit to stand trial or be sentenced if unable to understand the nature and purpose of the proceedings against him. *Medina v. California*, 505 U.S. 437, 439, 120 L. Ed. 2d 353, 359, 112 S. Ct. 2572, 2574 (1992).

Insofar as we are remanding this cause for a new trial due to the trial court's failure to conduct a fitness hearing pursuant to section 104—11, we need not pass on defendant's contention that he is also entitled to a new trial pursuant to section 104—21(a). Defendant's section 104—21(a) argument contends that he is entitled to a new trial because the trial court failed to conduct a fitness hearing despite evidence that defendant was ingesting psychotropic medication at the time of the trial and/or sentencing hearing. 725 ILCS 5/104—21(a) (West 1992). However, under the law as espoused by a majority of this court in *People v. Kinkead*, 168 Ill. 2d 394, 397 (1995), this court would first have to remand this cause for a hearing to determine whether defendant was actually taking psychotropic medication at the time of trial and/or sentencing because of the uncertainty about this in the record as currently developed. We decline to order such a hearing on remand, as it would be redundant in light of our determination that a new trial is otherwise required under section 104—11.

II. Failure to Secure a Written Jury Waiver in
Violation of Section 115—1, Hearsay Evidence
Admitted Pursuant to Section 115—10 and Guilt
Beyond a Reasonable Doubt

Because we reverse defendant's conviction on fitness grounds, we need not decide defendant's argument that the trial court erred in securing defendant's written jury waiver (see 725 ILCS 5/115—1 (West 1992)) or that certain hearsay testimony was elicited in violation of section 115—10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115—10 (West 1992)). We do observe, however, that there was sufficient evidence to support defendant's conviction and sentence; consequently, there is no double jeopardy impediment to a new trial. *People v. Brown*, 169 Ill. 2d 132, 169 (1996).

## CONCLUSION

We conclude that because a *bona fide* doubt regarding defendant's fitness arose at trial after which a fitness hearing was not held, defendant's conviction must be reversed and the cause remanded for a new trial.

The judgments of the appellate and circuit courts are reversed and the cause is remanded to the circuit court for a new trial.

*Judgments reversed;*
*cause remanded.*