No. 2--07--1216     Filed: 2-19-09

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) ) ) | Nos.   05--CF--3 05--CF--5 05--CF--12 05--CF--2469 |
| MATTHEW LUCAS, | ) ) ) | Honorable Kathryn E. Creswell, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the opinion of the court:

Defendant, Matthew Lucas, appeals his convictions of three counts of aggravated criminal sexual abuse (720 ILCS 5/12--16(c)(1)(i) (West 2006)), arguing that the trial court abused its discretion in concluding that the State, at an October 2006 fitness hearing, proved him fit to stand trial. We hold that the trial court's finding of fitness was against the manifest weight of the evidence. Accordingly, we reverse and remand.

Defendant was 20 years old in May 2005, but due to brain damage at birth defendant functions at the level of a 10-year-old. Defendant would choose playmates who were representative of his mental age. The alleged offenses occurred in May and August of 2005. During the first, defendant was playing doctor with nine-year-old T.S. Defendant unzipped her pants and touched a

coin and a pen cap to T.S.'s vagina. Defendant then touched her vagina with his hands and tongue. The second incident took place several days later. Defendant was playing with T.S. and nine-year-old A.C. Defendant told the girls that he had a magic trick, and defendant touched a coin to the vaginas of both girls. The last incident took place in August 2005. Defendant was playing with five-year-old D.H. Defendant pulled down D.H.'s pants and touched her "butt" and vagina with his hand.

On July 27, 2006, defense counsel filed a motion for a fitness determination based on his interactions with defendant. According to defense counsel, defendant "does not have a clue what goes on in a courtroom." Defendant did not understand defense counsel's explanations of the functions of the courtroom personnel, plea agreements, jury trials, subpoenas, or confrontation rights. When defense counsel questioned defendant regarding his understanding of the court process, defendant would put his head down and sit in silence. Defense counsel would repeat his explanations of the court process over and over again. Eventually defendant responded that he understood his attorney's explanations, but defense counsel doubted this to be the case, as defendant would merely repeat some of the words used by defense counsel without indicating any real understanding of counsel's explanations. The trial court found a <u>bona fide</u> doubt regarding defendant's fitness.

The trial court appointed Dr. John Murray, a licensed clinical psychologist employed by the 18th Judicial Circuit, to determine whether defendant was fit to stand trial. Dr. Murray evaluated defendant on August 15, 2006, and released his report on August 21, 2006. Dr. Murray's opinion was based on his review of arrest reports, indictments, grand jury testimony, and defendant's psychiatric, psychological, and medical records, and his interview with defendant and defendant's mother. Dr. Murray wrote in relevant part:

"Norman Chapman, MD has provided outpatient psychiatric treatment for Matthew Lucas since [his] psychiatric admission on 11/8/99. The records document continuous psychiatric treatment. The letter from Dr. Chapman dated 5/31/05 lists the following diagnoses, Bipolar Disorder, Type I, Most Recent Episode Mixed, Severe with Psychotic Features, Obsessive Compulsive Disorder, Attention Deficit Hyperactivity Disorder Combined Type, Oppositional Defiant Disorder, Learning Disabilities, Phonological Disorder and Enuresis. Treatment efforts since age seven are documented with outpatient and inpatient services, therapeutic day school and extensive trials of several medications. Matthew Lucas is described as decompensating, becoming more manic, impulsive and subject to out of control sexual impulses after medication prescription change of 4/19/05. Matthew Lucas is further described, given his severe immaturity, unable to discriminate any reasonably age appropriate recipient for his attention, did become remorseful, ashamed, rapidly suicidal and was hospitalized.

*** [D]uring birth Matthew experienced asphyxia for seven minutes with subsequent delays in early developmental milestones. At age 18 months a pediatric specialist identified Matthew with developmental delay and hypotonia. ***

*** The Vineland Adaptive Behavior Scale was administered through interview with Matthew and his mother. Matthew's adaptive abilities in all areas are impaired, *** and age equivalent ten year one month.

\* \* \*

Mr. Lucas does not present with an adequate or accurate understanding of the nature of the charges, role functions of the primary Courtroom personnel and currently unable to

meaningfully participate in a trial, plea agreement or sentencing hearing. His cognitive disorder and language problems interfere with his ability to readily understand and effectively communicate with his attorney or the Court. During the fitness interview Mr. Lucas presented with less coherent even tangential and somewhat confused thought process. His confusion is largely a function of being unaware of and simply not knowing the terms and concepts presented to him. He commented several times on watching popular police television programs, likely attempting to explain his situation through this information. Additionally, no diagnosis of mental retardation is identified for Mr. Lucas. He functions with cognitive impairment yet also presents as quite cooperative, willing to work with psychological professionals and has been well supported by his parents through his life. Mr. Lucas is understood as not fit to stand trial at this time, primarily due to his lack of knowledge and understanding of the terms and concepts as well as requiring more time, reinforcement and clarification to understand and apply the concepts to be fit to stand trial. There is a substantial likelihood Mr. Lucas would be restored to fitness within one year with continued psychiatric treatment and training and education specific to the elements of fitness to stand trial."

At the fitness hearing, Dr. Murray explained that, although defendant had a verbal IQ in the average range, a performance IQ in the borderline range, and a full scale IQ in the low-average range, defendant's cognitive disorder hindered his ability to communicate with his attorney, rendering him unfit to stand trial. The cognitive disorder was the result of his being asphyxiated for the first seven minutes of life. Defendant's low cognitive abilities affected his ability to express himself and articulate his thoughts. They also significantly impacted his ability to concentrate during court proceedings.

Defendant's brain damage was not curable, but defendant was able to adapt to the brain damage. Dr. Murray characterized defendant as very cooperative during the fitness interview, and Dr. Murray was able to "communicate effectively" with defendant, although defendant would stray off the subject at times. In terms of defendant's current adaptive abilities, his communication level was that of an 11-year-old, his socialization skills were those of an 8-year-old, and his daily functioning was that of a 10-year-old.

Dr. Murray further testified that, during the fitness interview, defendant correctly identified the judge and could identify the role of the judge to "some extent." Defendant knew that the judge would determine guilt and punishment. Defendant could adequately identify and understand the role of the prosecutor and the defense attorney. Defendant explained that his attorney's role was to "defend [him] in court to say this happened or that, to help to better help." In discussing the role of the prosecutor, defendant stated that the prosecutor would try to convince the judge that "he knew what he was doing. Had intent of doing wrong. Whatever." Defendant knew that he should not speak to the State's Attorney, but he could not explain why. Defendant did not understand the meaning of the word "trial." When defendant was asked who approved a plea agreement, defendant responded, "[J]ury then go to Judge is that right?" When questioned about juries, defendant responded that there were two juries--grand jury and "regular." He also mentioned jury duty. To Dr. Murray, this did not indicate an adequate understanding of a jury but rather reflected that defendant was merely associating words he had heard in the past with Dr. Murray's questions. Thus, in response to Dr. Murray's questions, defendant would simply list words he had heard, but he did not understand their meaning. Defendant did not know who picked the jury and did not understand the

role of the jury. Dr. Murray did not believe that defendant understood the trial process. Even after being given an explanation of a trial, defendant still did not understand the meaning of a trial.

When defendant was asked about the criminal charges pending against him, defendant responded, "child molestation, something like that," and defendant related that the charges involved his performing a magic trick on three girls, ages five and nine. Defendant had no idea what the words "predatory" and "abuse" meant. And although he understood the term "assault" to mean a physical attack, defendant did not understand the term in the context of these charges. Dr. Murray opined that, although defendant knew at a very general level what he was accused of, he was not "specifically aware" of the charges and had no realistic idea of the severity of the charges.

In sum, Dr. Murray opined that defendant's cognitive disorders created problems in terms of memory, comprehension, and verbal expression, and, as a result, the cognitive disorders impeded defendant's ability to communicate with his attorney. Dr. Murray opined that defendant was unable to meaningfully participate at trial due to his lack of knowledge of the specific components of the trial process. Dr. Murray further opined that, with proper reinforcement and treatment, defendant could learn the information necessary to participate in his trial and assist in his defense.

The State questioned Dr. Murray at the fitness hearing but did not retain its own expert. The trial court reviewed the evidence and concluded that the State had sustained its burden of proving defendant fit to stand trial, stating:

"Now my understanding of the law in the State of Illinois is that the Court has to evaluate expert evidence but the Court is the fact finder, free to accept or reject the opinion of an expert either in whole or in part. So just because there is testimony of only one expert here that's uncontradicted, the Court isn't merely a rubber stamp for that opinion.

The issue is whether or not the State has proven by a preponderance of the evidence that the Defendant is fit for trial, and I'm not going to go through all the findings of Dr. Murray. He put together a very comprehensive report, but he indicated that the Defendant was able to communicate effectively, with him, he understood the role of the judge, defense attorney, prosecutor. I find that he did understand the nature of the charges and I think the State is correct in arguing that although the Defendant might not understand what the words predatory or abuse mean, he understood that he was charged with child molestation of three girls, he was aware of their young ages, and I have to say having read the report, I was surprised at the ultimate conclusion that Dr. Murray came to both in the report and also here in court.

Based upon all of the information that is available to the Court, I find that the Defendant does understand the nature and purpose of the proceedings against him and he would be able to assist in his defense. State has met their burden of proving the Defendant fit by a preponderance of the evidence."

Defendant was convicted after a stipulated bench trial. Defendant timely appeals, arguing that the trial court erred in rejecting the expert testimony that he was unfit to stand trial where the testimony was uncontradicted.

Due process prohibits the prosecution of a defendant who is not fit to stand trial. People v. Haynes, 174 Ill. 2d 204, 226 (1996). Fitness speaks only to a person's ability to function within the context of a trial and does not refer to competence in other areas. Haynes, 174 Ill. 2d at 226. If a bona fide doubt of the defendant's fitness is raised, "the court shall order a determination of the issue before proceeding further." 725 ILCS 5/104--11(a) (West 2006). At the fitness hearing, the State

has the burden of proving, by a preponderance of the evidence, that the defendant is fit to stand trial. See People v. Schoreck, 384 Ill. App. 3d 904, 916 (2008). The trial court's determination of fitness will be reversed only if it is against the manifest weight of the evidence. Haynes, 174 Ill. 2d at 226. A finding is against the manifest weight of the evidence if it is not based on the evidence presented. People v. Deleon, 227 Ill. 2d 322, 332 (2008).

Although defendant did not raise the fitness issue in a postjudgment motion, "[f]itness for trial is a fundamental right, and therefore the plain error doctrine permits review of fitness issues that would otherwise be waived." People v. Meyers, 367 Ill. App. 3d 402, 409 (2006).

Ultimately, "[a] defendant is unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104--10 (West 2006). The trial court may consider the following factors during a fitness hearing in determining both the defendant's understanding of the nature and purpose of the proceedings and his ability to assist counsel:

"(1) The defendant's knowledge and understanding of the charge, the proceedings, the consequences of a plea, judgment or sentence, and the functions of the participants in the trial process;

(2) The defendant's ability to observe, recollect and relate occurrences, especially those concerning the incidents alleged, and to communicate with counsel;

(3) The defendant's social behavior and abilities; orientation as to time and place; recognition of persons, places and things; and performance of motor processes." 725 ILCS 5/104--16(b) (West 2006).

See Schoreck, 384 Ill. App. 3d at 916.

We agree with defendant that the trial court's fitness finding was against the manifest weight of the evidence. The uncontradicted and unimpeached expert evidence established that, due to his severe cognitive disability, defendant did not possess a sufficient understanding of the trial proceedings and the nature of the charges. Despite defendant's recognition of various courtroom personnel and his understanding of their roles in general terms, Dr. Murray opined that defendant did not actually understand the trial process. This opinion was supported by the evidence of defendant's ability to repeat legal terms and concepts but his inability to actually explain his responses. Further, although defendant stated that the charges against him were "child molestation," defendant, possessing the cognitive abilities of a 10-year-old child, did not have a full understanding of the nature of the allegations, as evidenced by his belief that he was arrested for showing a magic trick to three young playmates. This opinion was reinforced by Dr. Shane Reister, a licensed clinical psychologist, who evaluated defendant in September 2007. According to Dr. Reister, defendant suffered from serious organic cognitive impairments, and, "[e]ven though he has memorized a variety of therapy jargon words unfamiliar to the general public, his abstract reasoning skills and ability to generalize should not be overestimated." Although this evaluation was completed for sentencing purposes and was not available at the time of the fitness hearing, we may consider facts that arose after the fitness hearing. See People v. Sandham, 174 Ill. 2d 379, 389 (1996) (testimony and events, including those occurring during the sentencing hearing, are relevant to defendant's fitness at the time of trial); Schoreck, 384 Ill. App. 3d at 915 (same).

Furthermore, Dr. Murray's testimony established that defendant did not have the present ability to meaningfully communicate with defense counsel in order to assist in his defense, due to his problems with memory, comprehension, and verbal expression. If defendant had possessed the

capacity to assist in his defense, he may have assisted counsel in arguing that he did not perform the alleged acts for sexual gratification or arousal, elements necessary to sustain a conviction of aggravated criminal sexual abuse. See In re Matthew K., 355 Ill. App. 3d 652, 655 (2005) (the court could not infer that a 12-year-old child engaging in sexual conduct intended sexual gratification; rather whether the child acted with the intent to sexually gratify himself had to be decided on all of the evidence, including the offender's age and maturity). Dr. Murray's conclusion was further supported by defense counsel's representations that defendant did not understand even basic trial concepts and that, as a result, defendant often sat in silence during their consultations or merely repeated words used by the attorney. The State failed to offer any evidence to refute Dr. Murray's finding of unfitness, through a second opinion or otherwise.

In determining fitness, the trial court is not required to accept the opinions of psychiatrists. People v. Jones, 386 Ill. App. 3d 665, 671 (2008); People v. Baldwin, 185 Ill. App. 3d 1079, 1086 (1989). The trial court should assess the credibility and weight of expert testimony and independently analyze and evaluate the factual basis for the expert's opinion rather than rely on the ultimate opinion itself. Jones, 386 Ill. App. 3d at 671; Baldwin, 185 Ill. App. 3d at 1086. However, while it is within the province of the trial court to reject or give little weight to certain testimony, even expert testimony, this power is not an unbridled one. People v. Baker, 253 Ill. App. 3d 15, 30 (1993) (trial court's findings were against the manifest weight of the evidence where there was no basis to reject the testimony of four expert witnesses for the defense and no experts testified on behalf of the State); see also People v. Garcia, 156 Ill. App. 3d 417, 424 (1987) (the trial court's conviction of defendant was error where the State offered no expert testimony and two court-appointed psychiatrists concluded that defendant was insane at the time of the incident, yet the trial court rejected the experts'

opinions, drawing its own conclusions from the evidence). A trial court cannot reject an expert's opinion that a defendant is unfit without evidence that the defendant is fit. Jones, 386 Ill. App. 3d at 671; see, e.g., Schoreck, 384 Ill. App. 3d at 922 (as passable as defendant's understanding of courtroom personnel and of the general legal process seemed, the State left virtually unchallenged the expert's unfitness assessment; therefore, the trial court's finding that the State bore its burden of proving defendant fit to stand trial was against the manifest weight of the evidence); People v. Williams, 87 Ill. App. 3d 860, 864 (1980) (the trial court could not reject the uncontradicted expert conclusions that defendant was unfit solely on the basis of the trial court's brief and casual exposure to defendant or the court's " 'common sense' " interpretation of the psychiatric opinions).

Here, there was no evidence of fitness. The trial court's rejection of Dr. Murray's conclusions was not warranted where the doctor's testimony was unimpeached and unrebutted and had sufficient factual support. Furthermore, the court's reliance on its own interpretation of a few selective responses provided by defendant during the fitness interview was improper in light of the expert testimony that, although defendant was able to parrot legal terms he had heard from others or on television crime shows, he did not truly understand their meaning. In sum, the only evidence presented was that defendant was unfit.

This is not a case such as People v. Bleitner, 189 Ill. App. 3d 971 (1989), cited by the State, where the reviewing court found that the trial court's own observations of the defendant and credible lay testimony were sufficient to overcome the expert opinion. There, the expert testimony was not supported by specific facts, and the expert opinion was based almost exclusively on uncorroborated information provided by the defendant. Bleitner, 189 Ill. App. 3d at 976, 977; see also People v. Morgan, 250 Ill. App. 3d 728, 734 (1993) (where an expert's opinion is based upon the credibility

of the defendant, such opinion may be viewed with skepticism). Nor is this a case like People v. Baugh, 358 Ill. App. 3d 718, 732-33 (2005), where the court's own observations of the defendant's active involvement in the court proceedings contradicted the expert testimony that the defendant was unable to assist counsel in his defense due to his narcolepsy. Here, the court saw no such involvement. Unlike Bleitner and Baugh, all the evidence here supports the expert's opinion that defendant was unable to understand the charges against him and to assist in his defense. Defendant's cognitive impairments were well documented and Dr. Murray's opinion was well supported and unchallenged. Thus, the court's finding of fitness was against the manifest weight of the evidence. Accordingly, we reverse defendant's convictions and remand for a new trial, provided, of course, that he is fit for retrial. Baldwin, 185 Ill. App. 3d at 1091.

The judgment of the circuit court of Du Page County is reversed, and the cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

ZENOFF, P.J., and SCHOSTOK, J., concur.