2026 IL App (1st) 241468-U

No. 1-24-1468

SECOND DIVISION
June 9, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 23 CR 08677 |
| | ) | |
| RAUL MIRANDA, | ) | Honorable |
| | ) | Shelley Sutker-Dermer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE D.B. WALKER delivered the judgment of the court.
Justice McBride and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's robbery conviction and his sentence of three years in prison.

¶ 2    Defendant Raul Miranda appeals his conviction of robbery after a bench trial. On appeal, defendant contends that (1) the trial court erred when it failed to conduct a preliminary hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181, 189 (1984), on his posttrial allegations of ineffective assistance of counsel; (2) the trial court failed to conduct a fitness hearing where his statements in court demonstrated a *bona fide* doubt of his fitness to stand trial; and (3) his conviction should be

reduced to theft where the evidence was insufficient to prove that he used or threatened to use force when he took the victim's property. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Defendant was charged with robbery, aggravated robbery, and unlawful restraint regarding an incident that occurred on July 15, 2023 at City News Café & Bookstore in Chicago. At a pretrial hearing on January 8, 2024, defense counsel informed the court that defendant wanted a bench trial. After the trial court inquired about the mental health unit evaluation ordered by counsel, counsel responded that defendant "refused to participate," so it was withdrawn.

¶ 5    On February 15, 2024, defense counsel requested a conference pursuant to Illinois Supreme Court Rule 402 (eff. July 1, 2012). The trial court explained that it would consider the facts of the case, defendant's background and other information that may not be admissible at trial before making an offer to defendant. He would then be free to accept or reject the offer. When asked if he understood, defendant answered, "Yes, I do, your Honor." When asked if he would like the conference that morning, defendant responded, "Yes."

¶ 6    At the next hearing, defense counsel informed the court that defendant refused to participate in the mental health unit eligibility screening. The trial court had required the evaluation before it would consider probation. Counsel requested that the 402 conference continue. After the trial court admonished defendant regarding the conference, the following exchange occurred:

> "THE DEFENDANT: Yeah. I didn't agree to any of this 402 stuff. I was just asking
>
> if I had time to serve, and then they offered a counteroffer. And, you know, I already turned
>
> down the first 402 conference.
>
> THE COURT: You already what? I didn't hear that"

THE DEFENDANT: Turned down the first 402 conference. And I didn't want that either. And it keeps getting served to me.

THE COURT: So you want to go to trial on your case. *** There was an agreement to have a conference in front of the Court, for me to decide what the offer would be. If you don't want that, that's totally fine. *** We're still in the process of conferencing the case. But if you don't want one, the option is to set it for a bench or jury trial.

THE DEFENDANT: Right. I don't want a conference.

THE COURT: You don't want a conference.

THE DEFENDANT: I don't want a conference.

THE COURT: Do you want a bench or a jury trial, Counsel?

THE DEFENDANT: A bench trial.

* * *

THE DEFENDANT: I was wondering about the time serving.

[DEFENSE COUNSEL]: Judge, when I was speaking to him this morning before this case was called, we were anticipating a possible plea and calculating his time. So this is new news to me. But I'm happy to set it for a bench trial.

THE COURT: Do you want me to pass it for you to talk to him in more detail so that he understands the –

THE DEFENDANT: That's not worth anything now, the time served?

THE COURT: That's not how this works. *** I would make an offer. Your lawyer asked me to consider a mental health option, probation. That's obviously something you were not interested in participating in. *** But I'm totally fine with setting it for trial. I just want you to understand. We're going to set it for a bench trial. And it'll be continued until

there's an available date to go to trial. Do you need to talk to your lawyer or do you wish for me to continue it for trial?

THE DEFENDANT: I don't need to talk to my lawyer, no.

THE COURT: Ok."

¶ 7    Defendant's trial commenced on April 17, 2024. At trial, Danuta Kosiba testified that she was the morning shift manager at City News Café. She had worked at the café for the past nine years and was familiar with defendant because she had encountered him "hundreds of times, if not thousands," over the course of her employment. She stated that defendant had been "harassing" the neighborhood businesses "for a long time."

¶ 8    Kosiba testified that on July 15, 2023, around 9 a.m., she observed defendant standing in the enclosed vestibule leading to the entrance of the café. The vestibule was small so that "one person standing in there could fill it up." Since defendant stood in the vestibule without moving, a customer who was trying to leave the café could not do so. Kosiba twice asked defendant to leave because the customer was afraid to leave the business. When he did not do so, Kosiba told defendant that she was going to get her phone, take a picture of him, and call the police.

¶ 9    Kosiba testified that she left the vestibule to retrieve her phone, and upon returning, she propped open the door with her leg "to make an escape for me." As she pointed the phone at defendant to take his picture, he "ripped the phone" from her hand in a violent manner. She reached for her phone and yelled at defendant to give it back to her. As she tried to get her phone, defendant grabbed her right wrist and gave it a twist. The incident lasted five to ten seconds. Defendant then ran out the door and Kosiba attempted to grab him. Kosiba tried to chase defendant down the street, but he ran "very fast" and she lost sight of him. She returned to the café and called the police.

¶ 10    Kosiba testified that two days after the incident, she saw defendant twice. She did not call police when she first observed defendant but later called police when she saw him walking towards the café. The mailman told her that defendant was carrying a "car club," which Kosiba described as a device used on the steering wheel. When police arrived, Kosiba identified defendant as the person who had taken her phone. She stated that her phone was never recovered.

¶ 11    On cross-examination, Kosiba acknowledged that although she felt pain in her wrist for several days, she did not seek medical attention because she had work obligations. Kosiba stated that defendant had been banned from the store, and she was not happy to see him in the vestibule. She testified that the café had multiple cameras streaming images from different locations, including the vestibule area, onto a large screen. She acknowledged that it would have been possible to take a photo from the recorded images. Kosiba disagreed that her "phone was in [defendant's] face" when she tried to take his picture.

¶ 12    Detective Michael Duigan testified that he interviewed defendant after he was taken into custody. Defendant admitted that he took Kosiba's phone. He said he was upset because he was no longer allowed in the store. He intended to sell the phone for $350. Defendant thought the police may be tracking the phone, so he threw it into a dumpster. On cross-examination, Detective Duigan stated that when he spoke with Kosiba, she did not tell him that a customer was trying to leave the café while defendant stood in the vestibule.

¶ 13    The State rested and defendant moved for a directed verdict. In support, defense counsel argued that there was no evidence of unlawful restraint where the entire incident in the vestibule took place within "a matter of seconds." Counsel also argued that the State did not prove aggravated battery where the incident occurred within the vestibule of the business and not on a

public way. Counsel concluded, "with respect to the robbery, Count 1, I have no argument." The trial court denied the motion.

¶ 14    The trial court asked whether defendant would testify in his defense. Defense counsel responded that he did not wish to testify. The trial court advised defendant that he was the only person who could waive his right to testify. The court asked defendant, "Do you wish to testify today?" Defendant answered, "No." The trial court asked defendant, "And that's your choice, correct?" He responded, "Yes." The defense then rested without calling any witnesses.

¶ 15    In closing, the State argued that Kosiba was a credible witness, and the evidence supported defendant's conviction of unlawful restraint, aggravated battery and robbery. Defense counsel argued that the State failed to present sufficient evidence to convict defendant of all charges where the incident took place within a vestibule and not a public way, and Kosiba testified that defendant grabbed her wrist for mere seconds before he fled. Regarding the robbery charge, defense counsel argued that when Kosiba attempted to take a photograph of defendant inside the vestibule, "he reacted" by taking the phone. Counsel argued that defendant did not intend to gain control over the phone or permanently deprive Kosiba of it. Rather, he was simply attempting to stop her from taking a photo of him.

¶ 16    The trial court found defendant guilty of robbery, but not guilty of aggravated robbery and unlawful restraint. Defendant filed a motion for a new trial, which was denied.

¶ 17    A sentencing hearing was held on January 6, 2025. The State argued in aggravation that although this was defendant's first felony conviction, he had seven prior misdemeanor convictions that were "assault and battery related, and they took place in the same community where this robbery took place." In mitigation, defense counsel argued that this was defendant's first felony

conviction and he has spent 365 days in custody. Counsel argued that defendant's life circumstances contributed to his being homeless, which led to this "unfortunate incident."

¶ 18    In allocution, defendant stated:

"Well, in the neighborhood when I was a teenager, my brother was involved in a homicide and guns were involved and I wasn't able to testify as a character witness, and he was found guilty and sentenced to 12 1/2 years in jail. I was found a danger to self or others by the Social Security Administration after the encounter with DCFS and having some emotional problems. Because of that, I wasn't able to even be questioned as to represent my brother at the trial. And when my brother was asked to lift his shirt up, it covered his birth defects and revealed gang signs all over his chest and they found him guilty, giving that the court allowed a gangbanger to testify being they were involved in a crime and then they saw my brother's gang signs on his chest and the jury felt uncomfortable that gangbangers trying to get away with something where they allowed a gangbanger to testify and was witness to the trial. And since I wasn't there and under some money exchange in a DCFS case, that, you know, that I got emotionally sequestered by, and all this came about all at once, it turned into a big debacle and I got busy with a job and I kept getting laid off in the suburbs and find my way back into Chicago and tried to restart. And every time I restart, I run back into where I left off growing up in Chicago, the same people."

¶ 19    Defense counsel informed the court that defendant indicated he had $650 in his commissary account. He wanted to use the funds to reimburse the café for the new phone it had purchased for Kosiba. The trial court appreciated the gesture as one indicating defendant's "remorse for what happened to [Kosiba's] phone." After considering the presentence report and the evidence in

aggravation and mitigation, the trial court sentenced defendant to three years in the Illinois Department of Corrections on the robbery conviction, which was the minimum sentence it could impose. See 730 ILCS 5/5-4.5-35(a) (West 2024). The court stated that it would "recommend a facility with mental health treatment." It also ordered that defendant serve one year of mandatory supervised release.

¶ 20    At the end of the hearing, defendant spoke to the court:

"THE DEFENDANT: I have one more question. I was sent from one courtroom in criminal court over here. There was a change in venue in my name. When I got here, you stated in my name in my favor not guilty and then the public defender stated I'm not contesting the robbery because I pled the fifth amendment and was found guilty. Those are none of my choices.

THE COURT: I'm not sure what you're asking me. We had a trial. I did find you not guilty of the agg batt public way and the unlawful restraint. I found you guilty of the robbery at trial.

THE DEFENDANT: My understanding is that in the criminal court, I was seen by a judge in criminal court first and then there was change in venue made in my name and when I got in this courtroom, bench plea in my favor of not guilty and then the public defender not contesting the robbery as I pled the fifth amendment right against self-incrimination and was found guilty with no testimony and a bench plea of not guilty and a change in venue to this courtroom.

[DEFENSE COUNSEL]: Judge, I'll have a conversation with Mr. Miranda in the lock up. I have a transcript of the trial and we can go over the fact that we did contest all

of the charges since he had pled not guilty. Again, I'll also explain the process whereby the cases that come to us here, don't necessarily start here. They start elsewhere.

THE COURT: Right. They started somewhere else. They came here, they went to 26th Street and then it was assigned here. But once it became a felony charge, it's been in front of me since August 24, 2023, and I'm the judge that's heard everything on the case and I'm the judge that found you guilty.

THE DEFENDANT: There was a judge that filed a motion for discovery before this judge.

THE COURT: You might have been in another courtroom, in courtroom 105 where they found probable cause.

THE DEFENDANT: It was in criminal court at 26th and California.

THE COURT: And then you went to 26th Street for assignment.

THE DEFENDANT: That's where I went first.

THE COURT: I'm not sure, but I'll let your lawyer look that over and show you the transcript. As I've said, you can appeal this."

¶ 21    Defendant filed this appeal.

¶ 22                                    II. ANALYSIS

¶ 23    Defendant first contends that he raised a posttrial claim of ineffective assistance of counsel at the sentencing hearing, but the trial court failed to conduct a preliminary inquiry into his claim as required under *Krankel*. He argues that the matter should be remanded to the trial court for the purpose of conducting that inquiry.

¶ 24    *Krankel*'s procedure is triggered when a defendant raises a *pro se* posttrial claim of ineffective assistance of counsel. *People v. Ayres*, 2017 IL 120071, ¶ 11. When the claim is made,

the trial court should conduct a preliminary inquiry into the factual basis of the claim. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). If the claim lacks merit or pertains only to matters of trial strategy, the court may deny the *pro se* motion. *People v. Jolly*, 2014 IL 117142, ¶ 29. However, if defendant's claim indicates possible neglect of the case, new counsel should be appointed. *Id.* This process "serves the narrow purpose of allowing the trial court to decide whether to appoint independent counsel to argue a defendant's *pro se* posttrial ineffective assistance claims." *People v. Patrick*, 2011 IL 111666, ¶ 39.

¶ 25    To initiate *Krankel*'s procedure, defendant need only bring his ineffective assistance claim to the trial court's attention, and he "may raise the issue orally." *Ayres*, 2017 IL 120071, ¶ 11. Where a defendant expressly asserts a claim of ineffective assistance of counsel, that alone is sufficient to trigger a preliminary inquiry under *Krankel*. *Id.* ¶ 18. In this case, however, where no express claim of ineffective assistance was raised, a *Krankel* inquiry may be required if defendant's statements indicated his dissatisfaction with counsel's performance. *People v. Taylor*, 237 Ill. 2d 68, 77 (2010); see also *People v. Lobdell*, 2017 IL App (3d) 150074, ¶ 37 (finding the assertion that defendant did not understand trial counsel's failure to challenge the violation of his constitutional rights was sufficient to trigger a *Krankel* inquiry).

¶ 26    Here, defendant addressed the trial court after the sentencing hearing, and he appeared to raise two issues: (1) his confusion over the fact that his case began in one courtroom and "there was a change in venue" to another courtroom, and (2) "the public defender not contesting the robbery as I pled the fifth amendment right against self-incrimination and was found guilty with no testimony." Although defendant did not raise an express claim of ineffective assistance, he did question his counsel's performance in contesting the robbery charge where defendant had invoked his fifth amendment right not to testify, and thus, he "was found guilty with no testimony."

¶ 27 We find that defendant's statements were sufficient to trigger a preliminary inquiry under *Krankel*. Defendant contends that the trial court did not conduct a preliminary inquiry. However, a review of the record shows that the court did inquire into defendant's claims. "The operative concern for the reviewing court is whether the trial court conducted an *adequate* inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel." (Emphasis added.) *Moore*, 207 Ill. 2d at 78. Even if the preliminary inquiry was conducted in an improper manner, the error may be deemed harmless if it produced a neutral and objective record with which a reviewing court can assess defendant's claims. *People v. Jackson*, 2020 IL 124112, ¶¶ 126-27. Whether the trial court conducted a proper preliminary inquiry is a legal question that we review *de novo*. *Id.* ¶ 98.

¶ 28 Some type of exchange between the trial court and defense counsel regarding the circumstances of counsel's representation is "usually necessary" to assess whether further action is warranted on defendant's claim. *Moore*, 207 Ill. 2d at 78. During the exchange, counsel " may simply answer questions and explain the facts and circumstances surrounding the [ ] allegations." *Id.* That is precisely what occurred here.

¶ 29 After defendant expressed his concerns at the sentencing hearing, the trial court stated that it was "not sure what you're asking me." Defendant repeated his claims, and defense counsel responded, "I'll have a conversation with Mr. Miranda in the lock up. I have a transcript of the trial and we can go over the fact that we did contest all of the charges since he had pled not guilty." Counsel would also explain that cases can start in a different courtroom than the room where the trial takes place. After defendant stated that a different judge heard a pretrial motion in his case, the trial court responded, "I'm not sure, but I'll let your lawyer look that over and show you the transcript. As I've said, you can appeal this."

¶ 30 Although the exchange between defendant, the trial court, and defense counsel was brief,

a preliminary *Krankel* hearing need not be lengthy. See *People v. Banks*, 237 Ill. 2d 154, 215 (2010) (finding that two exchanges between the defendant and the trial court were sufficient to assess the basis of his claim where the court was familiar with the substance of the claim).

¶ 31    Moreover, during a preliminary inquiry, the trial court may assess defendant's ineffectiveness claims "based on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations." *Ayres*, 2017 IL 120071, ¶ 12. The trial court below presided over defendant's trial and most of the pretrial proceedings. The record shows that although defense counsel did not present witnesses on defendant's behalf, counsel thoroughly cross-examined Kosiba regarding the incident. During closing argument, counsel argued that robbery did not occur when defendant did not intend to gain control over or permanently deprive Kosiba of her phone. Instead, defendant was attempting to stop her from taking a photo of him.

¶ 32    Accordingly, when defendant expressed his concern that trial counsel did not contest the robbery charge, counsel replied that she had "a transcript of the trial and we can go over the fact that we did contest all of the charges since he had pled not guilty." When the inquiry ended, the trial court explained to defendant that his counsel would "show you the transcript." It is clear from the record that the trial court considered defendant's claim that defense counsel failed to contest the robbery charge and rejected it as contradicted by the record. The appointment of counsel is not necessary if, after a preliminary inquiry, the trial court finds that defendant's claim lacks merit. *Moore*, 207 Ill. 2d at 78.

¶ 33    Defendant argues that he also raised the issue of counsel's ineffectiveness where he did not testify at trial and it was not his choice. While defendant mentioned at the sentencing hearing that he did not testify, it was in the context of his claim that defense counsel failed to challenge the robbery charge. He never indicated to the court that he wanted to testify at trial. Nonetheless, the

record positively rebuts defendant's claim that he did not choose to exercise his right to remain silent. When defense counsel informed the trial court that defendant did not wish to testify, the court admonished defendant that only he could make that choice. The court then asked defendant, "Do you wish to testify today?" He answered, "No." The trial court confirmed, "And that's your choice, correct?" He responded, "Yes." We find no error here.

¶ 34    Defendant next contends that the trial court should have *sua sponte* ordered a fitness hearing where there was a *bona fide* doubt as to his fitness to stand trial. Defendant did not raise this issue below in a posttrial motion. To preserve an error for review, defendant must both (1) object to the error at trial, and (2) raise the error in a posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48. "Failure to do either results in forfeiture." *Id.* However, a reviewing court may consider an unpreserved claim if a clear or obvious error occurred and (1) the evidence was closely balanced, or (2) the error was so serious that it affected the fairness of the trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Since prosecuting defendant when a *bona fide* doubt exists as to his fitness renders the proceeding fundamentally unfair, we may review the claim under the plain error rule. *People v. Sandham*, 174 Ill. 2d 379, 382 (1996). The first step in plain-error analysis is to determine whether any error occurred. *Sebby*, 2017 IL 119445, ¶ 49.

¶ 35    A defendant is presumed fit to stand trial. 725 ILCS 5/104-10 (West 2024). However, a defendant may be found "unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." *Id.* "Fitness speaks only to a person's ability to function within the context of trial; it does not refer to sanity or competence in other areas." *People v. Coleman*, 168 Ill.2d 509, 524 (1995).

¶ 36    A *bona fide* doubt as to defendant's fitness exists if there is a "real, substantial and

legitimate doubt" assessed against an objective standard. *People v. Eddmonds*, 143 Ill.2d 501, 518 (1991). A court may consider defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on his competence. *People v. Harris*, 206 Ill. 2d 293, 304 (2002). There are no fixed or immutable signs that invariably indicate the need for further inquiry. *Id.* at 305. Once facts that raise a *bona fide* doubt of defendant's fitness are brought to the trial court's attention, it has a duty to order a fitness hearing *sua sponte*. *People v. McCallister*, 193 Ill. 2d 63, 110–11 (2000). Whether a *bona fide* doubt has arisen is generally a matter within the trial court's discretion. *Sandham*, 174 Ill. 2d at 382.

¶ 37    Defendant argues that a *bona fide* doubt existed where both the trial court and defense counsel commented on the "necessity" of mental health evaluations during the proceedings, and defendant's statements showed "disorganized thinking" and an "inability to adequately understand the proceedings." Defendant specifically points to the discussion regarding the 402 conference which, he argues, reflected his inability to follow the proceedings. He also points to his statement in allocution at the sentencing hearing which referred to his brother's trial and did not relate to his case. Defendant cites *Sandham* as support.

¶ 38    In *Sandham*, the following episodes and testimony occurred: (1) defense counsel made a pretrial motion to obtain a psychiatric evaluation of the defendant to determine his fitness; (2) prior to trial, the defendant was unable to cooperate with his counsel without difficulty and he was committed to a psychiatric ward; (3) the defendant sent two letters to the court that were hostile and, at times, nonsensical; (4) the defendant made threatening phone calls to the trial judge; (5) his mother testified that the defendant was not "all the way there;" (6) an evaluation suggested the defendant had a "slight chemical imbalance" and was "slightly schizophrenic;" (7) the defendant was taking psychotropic medications around the time of trial and sentencing; and (8) an outburst

during sentencing to "[c]ut my brain out," and defendant's statement that he had "three albums on the top of the charts and comic books all over." *Id*. at 388. At one point, the trial court told the defendant, "You don't even seem to understand what's going on. You are making comments that are obviously inappropriate ***." *Id*. at 386.

¶ 39    Our supreme court found that "the instant events and testimony combined to raise a *bona fide* doubt as to defendant's fitness to stand trial or be sentenced." *Id*. at 389. Although a *bona fide* doubt arguably existed beforehand, the trial court should have conducted a fitness hearing, *sua sponte*, when it questioned the defendant's capacity to understand the proceedings. *Id*.

¶ 40    In this case, unlike *Sandham*, neither the trial court nor defense counsel expressed concern that defendant could not understand the nature and purpose of the proceedings against him or assist in his defense. It is true that counsel and the court commented on having defendant undergo a mental health evaluation, which he ultimately refused to do. However, the purpose of that evaluation was to assess whether probation would be an appropriate disposition in defendant's case. The fact that defendant may have mental health issues that should be identified for probation purposes does not, by itself, indicate an unfitness to stand trial. See *People v. Coleman*, 168 Ill. 2d 509, 524 (1995) (noting that "[a] person can be fit for trial although his mind may be otherwise unsound;") see also *Eddmonds*, 143 Ill. 2d at 519 (finding that fitness refers only to defendant's ability to function at a trial and not to his competence in other areas).

¶ 41    Moreover, defendant's interactions with the trial court showed that he understood the proceedings against him and could assist in his defense. Although defendant abruptly put an end to the 402 conference, he had a reason for doing so. His discussion with the court indicated that he was only interested in a deal if he would receive time already served. He asked, "That's not worth anything now, the time served?" The court responded, "That's not how this works. *** I would

make an offer. Your lawyer asked me to consider a mental health option, probation. That's obviously something you were not interested in participating in. *** But I'm totally fine with setting it for trial." Defendant informed the court that he wanted a bench trial. Although defense counsel expressed surprise at defendant's decision, defendant made a rational choice based on his desired outcome for the proceedings.

¶ 42   Defendant's statement in allocution, while rambling, also showed that he understood the nature of the proceedings against him. When defendant informed the trial court of his difficulty in dealing with his brother's criminal trial, because he felt guilt for not being able to testify in his brother's defense, he understood that such information served as mitigating evidence at his sentencing hearing. He attempted to explain how his life circumstances led him to this point. Furthermore, defendant offered to repay the café for having to purchase a new phone for Kosiba. The trial court appreciated the offer and imposed the minimum sentence of three years.

¶ 43   If a defendant understands the nature of the charges against him and can, in cooperation with counsel, conduct his defense in a rational and reasonable manner, he is fit to stand trial even if his mind may be otherwise unsound. *Eddmonds*, 143 Ill. 2d at 521. We cannot say the trial court abused its discretion by failing to hold a hearing *sua sponte* into defendant's fitness. Without error, there can be no plain error. *People v. Hood*, 2016 IL 118581, ¶ 18.

¶ 44   Defendant's final contention is that the evidence at trial was not sufficient to prove him guilty of robbery. He therefore requests that this court reduce his conviction to theft.

¶ 45   When the sufficiency of the evidence is challenged, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Cardamone*, 232 Ill. 2d 504, 511 (2009). The trier of fact is responsible for assessing the credibility of the witnesses,

weighing the testimony, and drawing reasonable inferences from the evidence. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). When considering the sufficiency of the evidence, the reviewing court does not retry the defendant. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011). Rather, we will reverse a criminal conviction only where the evidence is so improbable or unsatisfactory that there exists a reasonable doubt as to the defendant's guilt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005).

¶ 46    A person commits the offense of robbery when he or she "knowingly takes property \*\*\* from the person or presence of another by the use of force or by threatening the imminent use of force." 720 ILCS 5/18–1(a) (West 2024). The use of force or threat of force causes the victim to part with possession or custody of property against his or her will. *People v. Klebanowski*, 221 Ill. 2d 538, 550 (2006). The State need not prove that force was used immediately before or during the time of the taking. *People v. Merchant*, 361 Ill. App. 3d 69, 74 (2005). It is sufficient that defendant used force as "part of a series of events that constitute a single incident or occurrence." *People v. Dennis*, 181 Ill. 2d 87, 102. The distinguishing element between robbery and theft is that theft is a simple deprivation of property, whereas robbery is deprivation of property, plus the use of force or the threat of force. *People v. Washington*, 375 Ill. App. 3d 243, 249 (2007).

¶ 47    Defendant argues that he did not use force when he snatched the phone from Kosiba's hand, citing *People v. Patton*, 76 Ill. 2d 52 (1979). In *Patton*, the victim testified that as the defendant walked towards her, he swiftly grabbed her purse, throwing her arm back "a little bit." *Id*. at 48. The defendant then fled with her purse. Although he was convicted of robbery, the appellate court reversed and remanded, with directions to the trial court to enter a judgment of conviction for theft. *Id*. at 47. On appeal, the supreme court affirmed the appellate court. *Id*. at 52.

¶ 48    *Patton* is distinguishable where the victim testified that her arm was merely thrown back "a little bit" as the defendant snatched her purse, and she never stated that she was hurt by the

action. Also, there was no struggle between the victim and the defendant after the taking.

¶ 49    In this case, defendant exerted additional force on Kosiba *after* he had ripped the phone out of her hand. As they struggled for the phone, defendant grabbed Kosiba's right wrist and gave it a twist before fleeing with the property. Kosiba testified that her wrist was sore for a few days. It is well-established that when property is taken, and a struggle ensues between the victim and the offender for possession of the property, sufficient force can exist to support a robbery conviction. See *Merchant*, 361 Ill. App. 3d at 74–75 (finding that "the immediacy of the struggle following the taking[] supports our conclusion that the crime amounted to a robbery").

¶ 50    In finding defendant guilty of robbery, the trial court determined that the evidence showed the use of sufficient force by defendant. The trial court, as the fact finder, is responsible for drawing inferences from the evidence. Viewing the evidence in the light most favorable to the prosecution, we cannot say that the trial court's determination was so improbable or unsatisfactory that there exists a reasonable doubt that defendant committed robbery. We therefore decline to reduce defendant's conviction to theft.

¶ 51                                III. CONCLUSION

¶ 52    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 53    Affirmed.