2023 IL App (4th) 220797

NO. 4-22-0797

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 13, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Morgan County |
| DUSTIN A. FINLAW, | ) | No. 18CF143 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Jack D. Davis II, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court, with opinion.
Justices Steigmann and Zenoff concurred in the judgment and opinion.

**OPINION**

¶ 1        Defendant Dustin A. Finlaw was convicted of first degree murder (720 ILCS
5/9-1(a)(1) (West 2018)) following a jury trial and was sentenced to 40 years in prison. In this
direct appeal, he argues that the trial court erred by (1) finding that his fitness for trial had been
restored and (2) allowing him to proceed *pro se* despite his mental health issues and
noncompliance with medication. For the reasons that follow, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3                                  A. Underlying Offense

¶ 4        The State charged defendant with three counts of first degree murder in the death
of Robert Utter. The evidence produced at trial showed that authorities responded to a 911 call in
the early morning of May 24, 2018, and found Utter deceased in his vehicle, with multiple stab

wounds to his head, back, and neck. An eyewitness described a black male with dreadlocks near the scene the same morning; law enforcement later secured surveillance video from the area that captured an individual matching the eyewitness's description. Analysis of Utter's phone revealed contact with defendant via social media. Defendant's profile picture associated with a related social media account matched the description of the individual leaving the area where Utter was found.

¶ 5        Detectives interviewed defendant. He claimed to have been at home during the time in question and that he could not have been captured on surveillance video. He admitted that he maintained a social media account with the same username as the one used to communicate with Utter but said he had deleted the application. The detectives informed defendant they would be taking his phone for analysis, at which time defendant threw the phone against the ground in an attempt to destroy it; he was then arrested.

¶ 6        Defendant participated in numerous follow-up interviews, each time altering his version of events. In the first follow-up interview, defendant stated he left his house to take a jog and visit a local bait shop where the surveillance footage was taken. He claimed that he did not know Utter and denied any involvement in his death. In the second interview, defendant admitted that Utter picked him up in his vehicle, but he said there was another individual in the back seat. Utter had told defendant that he was dropping off the individual in the back seat, referred to as Darren, at a boat club. Once they arrived at the boat club, however, Darren began stabbing Utter from the back seat, at which point defendant fled. Defendant subsequently provided the full names of two individuals he thought could be Darren. He identified a man in a photo shown to him by police as Darren, but that person was incarcerated in the Illinois Department of Corrections at the time of the offense.

¶ 7		In his final interview with detectives, defendant stated that he lost consciousness once he stepped into Utter's vehicle. When he regained consciousness, he was covered in blood. Defendant claimed that he heard "voices" and had visual hallucinations of "floating heads" and "aliens." Sometimes he would "black out" when the "floating heads" entered his body. Defendant referred to the aliens as "grays" and said one named Seraphin guided him and told him to stop talking.

¶ 8		B. Finding of Unfitness and Subsequent Events

¶ 9		On defense counsel's motion, the trial court appointed psychiatrist Dr. Terry Killian to conduct a mental examination of defendant to determine whether he was fit to stand trial. Dr. Killian interviewed defendant on August 30, 2018, and compiled a seven-page report.

¶ 10		Defendant reported seeing two aliens since he was 11 years old. The primary alien he spoke with and listened to was Seraphin, who told defendant not to talk to other people and not to take medication or she would "go away." He also claimed to see "orbs." The report states:

> "The nature of [defendant's] psychotic symptoms suggest very strongly that he has a fairly severe form of schizophrenia. He reports auditory and visual hallucinations; has a variety of rather bizarre delusional beliefs; described having thought insertion (*i.e.*, the belief that people can put thoughts into his head through eye contact); has delusions of reference (*i.e.*, that music on the television is intended to communicate directly to [defendant]); and his behavior [showed] essentially a complete lack of emotional connectedness as though he was completely vacant inside."

Dr. Killian diagnosed defendant with "probable severe schizophrenia" and concluded, to a reasonable degree of psychiatric certainty, that defendant was unfit to stand trial because his psychotic symptoms rendered him "incapable of communicating in a clear and rational fashion

with his attorney or anyone else." Dr. Killian believed defendant could be restored to fitness within one year with a regimen of antipsychotic medication administered in an inpatient setting.

¶ 11        At an October 2018 status hearing, the State stipulated to the contents of Dr. Killian's report. The trial court found defendant unfit to stand trial and ordered him transferred to the Illinois Department of Human Services (DHS) to receive treatment with the goal of attaining fitness within one year.

¶ 12        Following treatment at DHS, the trial court received a report dated February 22, 2019, from Dr. Terrence Casey, concluding that defendant's psychosis was in remission and that he was not experiencing audio or visual hallucinations. Dr. Casey's report further opined that "[defendant] currently possesses adequate knowledge of basic court proceedings; has a thorough understanding of his charges, ***; and demonstrates the capacity to assist in his own defense. He has shown remission of his psychotic symptoms and understands the importance of treatment compliance." Dr. Casey concluded defendant was fit to stand trial. On March 4, 2019, the court entered an immediate transport order directing the return of defendant to the county jail.

¶ 13        In May 2019, prior to the restoration of fitness hearing, defense counsel moved for the appointment of Dr. Killian to reexamine defendant. Counsel alleged that, since returning to the county jail, defendant complained of the same auditory and visual hallucinations that were identified when he was found unfit. The matter was continued, with the trial court reserving its decision on whether Dr. Killian would be able to render an opinion on defendant's fitness for trial based only on a review of DHS treatment records. The court also issued an order directing all treatment records of defendant in the possession of DHS be provided to defense counsel.

¶ 14        Ultimately, Dr. Killian stated he would need to conduct another examination to render an opinion on defendant's fitness. The trial court denied defendant's motion for

reexamination, finding no authority to support such a request. The court was concerned about a slippery slope in that, if it were to grant the request, "the Court would put in motion a chain of events that may never end." Despite the court's denial of the request for reexamination, defense counsel had defendant reexamined at the expense of the public defender's office.

¶ 15    On October 18, 2019, Dr. Killian reexamined defendant. He compiled a report with his findings from that interview and his review of "more than 100 pages" of DHS treatment records. Regarding the DHS documents, the report stated, "Unfortunately, none of the [DHS] records give much clinical information regarding [defendant's] behavior or statements during his time at [DHS] especially in the final report in which they found him fit to stand trial." According to the documents, defendant was found in possession of multiple "shanks" in December 2018, threatened a staff member, and refused to take his medication while at DHS until compliance was court enforced in January 2019. Also in January 2019, DHS documented that defendant was still having hallucinations after two weeks of medication compliance, with Seraphin "telling him to hurt people." In the middle of February 2019, defendant told staff at DHS that he had not seen aliens in two weeks and stated a desire to be found fit. Dr. Killian lamented the lack of detail in the reports and found it "extremely unlikely" defendant was free of psychotic symptoms as suggested by DHS.

¶ 16    In the findings from his interview Dr. Killian stated:

"Identical to last year, [defendant] is still obviously severely psychotic with a number of bizarre delusional ideas as well as frequent auditory hallucinations, the delusional belief that people can put thoughts into his head through the process of eye contact, that [Seraphin] communicates with him telepathically, and the music on the television is sometimes intended for the purpose of communicating directly

to [defendant]. [Defendant] told me he essentially always does what [Seraphin] tells him to do regardless of what other people tell him (*e.g.* he told me he would follow [Seraphin's] instructions rather than [his attorney's] recommendations)."

The report concluded that defendant's condition was effectively unchanged since his last interview. Dr. Killian opined, to a reasonable degree of psychiatric certainty, that "as a result of [defendant's] current psychotic symptoms which render him incapable of communicating in a clear and rational fashion with his attorney or anyone else," defendant was unfit to stand trial. He also did not believe defendant's fitness could be restored within one year.

¶ 17 Almost a year and a half passed before the State was able to secure a follow-up interview with defendant by its rebuttal expert, Dr. Phillip Pan. Following his examination, Dr. Pan issued a report dated February 3, 2021, noting that defendant "reported seeing some of the 'orbs' or lights earlier this year" while denying "other symptoms of psychosis, including auditory or other visual hallucinations." Dr. Pan found that defendant had schizophrenia. He also concluded that, while defendant was qualified to plead guilty but mentally ill, he demonstrated an adequate understanding of trial procedure and "was able to communicate with counsel in his defense."

¶ 18 Another delay ensued due to scheduling issues before the trial court was able to conduct a restoration of fitness hearing. On March 25, 2021, approximately two years after defendant was discharged from DHS, the court held a hearing to determine whether he was fit to stand trial.

¶ 19 C. Restoration of Fitness Hearing

¶ 20 1. *Mental Examinations Provided by the State*

¶ 21 At the hearing, the State introduced the reports of Dr. Casey and Dr. Pan. Defense counsel stipulated to the contents of the reports but not their conclusions as to defendant's fitness. The State also called defendant to testify.

¶ 22         2. *Defendant's Testimony*

¶ 23 On the stand, defendant demonstrated a clear understanding of the legal process and the roles of the various individuals involved. He listed the several offenses he was charged with and the sentencing range he faced if found guilty of first degree murder. When asked if there were any issues in communicating with defense counsel about the case, defendant stated, "No." Defendant explained he had discussed possible defense strategies with counsel and his wishes in regard to those strategies during trial. He was able to explain the meaning and consequences of being found guilty, not guilty, and not guilty by reason of insanity. Defendant was prescribed medication while at the DHS facility, with one medication being an antipsychotic and another used to treat anxiety. He did not take the medicine every time it was given but took it "most of the time." He explained, "If I don't feel like taking the meds, then I won't." He denied having any hallucinations in the "recent past" and believed the last time he had a hallucination was in 2018. Defendant clarified that he was hearing voices in 2018 when at the county jail due to acute post-traumatic stress disorder after witnessing Utter stabbed to death, which led to nightmares and sleep deprivation. Defendant stated that he was misdiagnosed with schizophrenia and did not suffer from any mental illness. He expressed a desire for the trial court to find him fit to stand trial.

¶ 24 On cross-examination, defendant stated that he had never been under the influence of a voice that would direct him to not speak to defense counsel. He could not recall his initial interview with Dr. Killian, or the subsequent interview, and he also could not recall talking about his hallucinations or Seraphin. He also could not recall stating that Seraphin tells him what to say

and when not to talk. When pressed about the meaning of "mostly" regarding the consistency of compliance with his medication, defendant stated he took most of his medications "80 percent of the time" but took his antipsychotic medication less frequently. While at the DHS facility, he was attacked by another resident. He did not enjoy his time at the facility and did not want to go back. He knew that if he was found unfit he would return to DHS. Defendant clarified that he was not suffering from sleep deprivation while at DHS due to the better accommodations; upon returning to the county jail and before being reinterviewed by Dr. Killian, he was once again suffering from sleep deprivation that led to hallucinations. He had since become accustomed to the county jail after spending three years there and was no longer having issues sleeping.

¶ 25                                     3. *Dr. Killian*

¶ 26          Defense counsel called Dr. Killian to testify and submitted his 2018 and 2019 reports into evidence. According to Dr. Killian, defendant was unchanged in the year between the 2018 and 2019 visits, and he still believed defendant was unfit. During both visits, defendant was suffering from severe hallucinations; the most common one involved Seraphin. During the 2019 visit, defendant stated that Seraphin would tell him what to do or not to do, and defendant usually acquiesced. Seraphin was telling defendant not to talk to Dr. Killian. Dr. Killian conceded that while sleep deprivation "might explain some [of defendant's] hallucinations," it would not explain all the other symptoms exhibited. Generally, an individual who is psychotic and suffering from schizophrenia is treated with antipsychotic medications, and they must be taken regularly to be effective. If defendant were not taking the medication regularly, "his psychotic symptoms would be worse" and would not improve without "consistent, effective" medication. Because defendant stated that he would almost always do what Seraphin tells him to, even over the advice of counsel, he was unable to assist in his defense. Dr. Killian felt that Dr. Pan's report did not address whether

Seraphin was telling defendant what to say or do. Dr. Killian's report also noted that defendant's testimony was inconsistent with the documentation of hallucinations in early 2021. Dr. Killian theorized that Seraphin could be telling defendant not to tell anyone that he still saw her, just as she had done during defendant's time at DHS to secure a discharge back to the county jail.

¶ 27     On cross-examination, Dr. Killian clarified that the hearing was the first time he had seen defendant interact with his counsel. Dr. Killian also acknowledged that defendant's behavior during the interviews formed the basis of his diagnosis; his behavior and demeanor displayed while testifying were improved to the point Dr. Killian was "surprised" by the way defendant spoke so clearly. He also stated that "someone can have a lot of hallucinations and be fit to stand trial." The State ended its questioning as follows:

"Q. So your concern with [defendant] is if he is having these hallucinations now he would be unfit to stand trial, because these hallucinations would make him do something against his attorney's advice?

A. Yes, because, because he said he does what Seraphin says, not what other people say.

Q. And that's, that's your concern?

A. Absolutely. That is my absolute number one concern."

¶ 28     The trial court interjected and asked Dr. Killian if he believed Seraphin was controlling defendant or telling him what to say to be found fit. Dr. Killian responded that it was a concern, as defendant usually does what Seraphin says, but he did not know for sure that was occurring; Dr. Killian had not seen defendant since October 2019, and defendant had not specifically stated that he was following Seraphin's direction. The court then asked if Dr. Killian had experienced an individual that heard voices telling them or teaching them how to appear fit or

sane for trial. In response, Dr. Killian stated that Seraphin knew what defendant knew; if defendant had a cognitive understanding of what was required to appear fit, so would Seraphin. In response to a follow-up question from the court, Dr. Killian further clarified that hearing voices alone did not render one unfit for trial. Rather, "[it] depends on what the voices say" and whether it interferes with the individual's functional capacity. In this case, defendant heard a voice that told him not to follow the advice of counsel.

¶ 29                              4. *Stipulation to Jailhouse Nurse's Testimony*

¶ 30          The parties stipulated that, if called to testify, the nurse in charge of providing medication to defendant would state that defendant was prescribed an antipsychotic medication that he refused to take a majority of the time. Moreover, "she would also testify that [defendant] has told her don't even offer it to me because I don't want it." Following the stipulation, the trial court took the matter under advisement.

¶ 31                              5. *Trial Court's Order*

¶ 32          At the subsequent hearing, the trial court heard argument from defense counsel. Counsel conceded that the issue of defendant's fitness hinged on the court's finding as to the second prong of the statutory fitness criteria: the ability of defendant to assist counsel in his defense.

¶ 33          After argument, the trial court stated it had reviewed all of the reports submitted and issued a ruling from the bench, finding the only issue was whether defendant could assist in his defense. The court found defendant fit to stand trial, reasoning that defendant answered every question asked of him rationally, with a seeming knowledge of what was being asked. The court noted that individuals "don't always get along with their attorney," but given defendant's demeanor and responses while testifying, he could assist counsel in his defense.

¶ 34    The trial court also addressed the concern that defendant was being directed by Seraphin, stating:

> "Dr. Killian said I guess he's presuming that the defendant is still hearing voices. I don't know how we would ever overcome presuming someone's hearing voices, since he feels that since he heard them in the past he must be hearing voices and those voices must be telling him how to answer questions to stay fit or to be found fit, so the Court finds the defendant fit to stand trial."

The court did not address defendant's compliance with medication.

¶ 35                              D. Waiver of Counsel

¶ 36    A different judge presided over the remainder of the proceedings in this case. At the beginning of the first status hearing after defendant was found fit, the trial court stated, "I've reviewed the entirety of the docket in this matter. I've reviewed the procedural posture and the contents of both files that were provided to me." The State also alerted the court to the prior proceedings, noting it had "been pending for a while based on some fitness issues, but I believe that those fitness issues are behind us." At the hearing, defendant moved to waive counsel and represent himself with the appointment of standby counsel. The trial court stated, "No one is ever going to tell you that you don't have the constitutional right to elect to represent yourself ***. There is absolutely no argument that you will receive from anybody on that. That is your constitutional right." The court then cautioned defendant to seriously consider the request he was making, likening proceeding *pro se* to waiving the assistance of a surgeon and performing surgery on oneself while expecting "anything but a bad result."

¶ 37    The trial court reviewed all the charges defendant faced, their penalties, the possibility of consecutive and concurrent sentencing, and his right to counsel. The court also

provided additional admonishments pursuant to *People v. Ward*, 208 Ill. App. 3d 1073, 1081-82 (1991) (noting that to ensure defendant's request to proceed *pro se* involved an intelligent and knowing waiver of the right to counsel, it is desirable to inform defendant of 10 additional matters related to self-representation). Defendant stated he understood all of the admonishments. The court then gave defendant a document containing the *Ward* admonishments and asked him to reflect on them while considering the decision to proceed *pro se*. The matter was then continued.

¶ 38　　　　At a subsequent hearing, defendant presented a prepared statement to the trial court giving his reasons for wanting to proceed *pro se*, which the court read into the record. The statement explained the adversarial process and that the number of resources available to indigent defendants was paltry when compared to those of the State. He insisted there was a conflict of interest in defense counsel's representation because counsel wanted defendant to "plead insanity," while defendant maintained that he was innocent of the offenses. Defendant claimed he was ready to present evidence at trial in support of his "opaque alibi" and discredit "the circumstantial evidence against me that led detectives to believe that I was the culprit." He also claimed to have a list of witnesses to call that included rebuttal witnesses and character witnesses.

¶ 39　　　　The trial court again admonished defendant of the charges he faced, their penalties, the possibility of consecutive and concurrent sentencing, and his right to counsel. Defendant stated he understood those admonishments. The court questioned defendant about his age, level of education, comprehension of the English language, and ability to read and write. The court stated, "You have demonstrated your ability to articulate your positions here with me. At least I'm comfortable with that." The court found a knowing, intelligent, and voluntary waiver of the right to counsel and allowed defendant to proceed *pro se* with the assistance of standby counsel.

¶ 40　　　　　　　　　　　　　　　　E. Trial

¶ 41 The matter proceeded to a jury trial. Ultimately, the jury found defendant guilty, and the trial court sentenced him to 40 years' imprisonment.

¶ 42 This appeal followed.

¶ 43                                    II. ANALYSIS

¶ 44 Defendant argues that the trial court provided an inadequate restoration hearing by failing to exercise its discretion. Defendant also argues that the court erred in allowing him to proceed *pro se* without further questioning his competence.

¶ 45                                     A. Fitness

¶ 46 Defendant argues that "[t]he trial court failed to hold an adequate restoration hearing" by (1) relying only on defendant's testimony in finding him fit, (2) disregarding the overwhelming evidence defendant was unfit, (3) failing to resolve inconsistencies in defendant's testimony, and (4) misapplying the presumption defendant was unfit. Defendant states that he failed to properly preserve his claims for review but requests review under the second prong of the plain error doctrine. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (finding that to preserve an issue for review, a party must raise the issue at trial and in a written posttrial motion).

¶ 47 The first step in plain error review is to determine whether a clear or obvious error occurred. *People v. Jackson*, 2022 IL 127256, ¶ 21. The second prong of plain error review is equivalent to reviewing for structural error, requiring automatic reversal where the error serves to erode the integrity of the judicial process and undermine the fairness of a defendant's trial. *People v. Thompson*, 238 Ill. 2d 598, 613-14 (2010). Fitness for trial involves a fundamental right; consequently, defendant's claim is reviewable as plain error under the second prong. See, *e.g.*, *People v. Shaw*, 2015 IL App (4th) 140106, ¶ 23.

¶ 48 It is axiomatic that the due process clause of the fourteenth amendment (U.S. Const., amend. XIV) prohibits prosecution of a defendant who is mentally unfit to stand trial. *People v. Waid*, 221 Ill. 2d 464, 470 (2006). The United States Supreme Court has articulated that the constitutional test for mental competence is based on whether a defendant has a rational as well as factual understanding of the proceedings and a sufficient present ability to consult with counsel to a reasonable degree of rational understanding. *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996). The Illinois legislature has codified the state's standard for competence by promulgating section 104-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/104-10 (West 2020)), which states, "A defendant is unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense."

¶ 49 The law presumes a defendant is fit to stand trial (*id.*), but once found unfit at an initial fitness hearing, a presumption attaches at any subsequent fitness hearing that the defendant remains unfit until proven otherwise by the State. *People v. Gillon*, 2016 IL App (4th) 140801, ¶ 20. "[T]he burden of proving that the defendant is fit by a preponderance of the evidence and the burden of going forward with the evidence are on the State." 725 ILCS 5/104-11(c) (West 2020).

¶ 50 "Fitness speaks only to a person's ability to function within the context of a trial; a defendant may be fit to stand trial even though his mind is otherwise unsound." *People v. Haynes*, 174 Ill. 2d 204, 226 (1996). In other words, having a mental illness does not on its own render an individual unfit to stand trial. A trial court must render a final decision on a defendant's fitness by exercising its independent discretion, and the court " 'should be active, not passive' " in the proceedings. *Shaw*, 2015 IL App (4th) 140106, ¶ 25 (quoting *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 29). The determination of whether a defendant is fit to stand trial must be made by the trial court, not the experts. *People v. Bilyew*, 73 Ill. 2d 294, 302 (1978).

¶ 51        Defendant concedes that the crux of the issue before the trial court was whether he could assist counsel with his defense, as he demonstrated his understanding of the nature and purpose of the proceedings against him. Therefore, to find him fit, the court had to find that defendant could rationally consult with his attorney to assist in his defense. *People v. Holt*, 2014 IL 116989, ¶ 51. More specifically, the court was required to find that defendant had the present ability to consult with counsel with a reasonable degree of rational understanding. *Id.*

¶ 52                              1. *Standard of Review*

¶ 53        The Illinois Supreme Court has stated plainly that "[t]he trial court's ruling on the issue of fitness will be reversed only if it is against the manifest weight of the evidence." *Haynes*, 174 Ill. 2d at 226; see *People v. Stahl*, 2014 IL 115804, ¶ 40 (stating that the issue presented was whether, under the totality of the circumstances, the trial court's finding of unfitness "was against the manifest weight of the evidence"); *People v. Mahaffey*, 166 Ill. 2d 1, 18 (1995) ("We do not believe that the trial judge's finding that the defendant was fit for trial was against the manifest weight of the evidence.").

¶ 54        Defendant, however, argues that the question presented here is whether the trial court abused its discretion, and the State agrees we should employ the abuse of discretion standard of review. The parties' agreement on the appropriate standard does not end the inquiry, however, as we will not apply the wrong standard even if it is agreed upon; a court of review is not bound by a party's concession. *Beacham v. Walker*, 231 Ill. 2d 51, 60 (2008).

¶ 55        The abuse of discretion standard is "traditionally reserved for decisions made by a trial judge in overseeing his or her courtroom," such as the admission of evidence. *In re D.T.*, 212 Ill. 2d 347, 356 (2004). A trial court's decision on fitness is not a matter of discretion; it is a matter of *evidence*. Once a *bona fide* doubt as to fitness is raised, the State bears the burden of proving

fitness by a preponderance of the evidence. *Stahl*, 2014 IL 115804, ¶ 26. "Typically, the manifest error standard is appropriate to review findings of fact made by a trial judge." *Webster v. Hartman*, 195 Ill. 2d 426, 432 (2001); see *People v. Richardson*, 234 Ill. 2d 233, 251 (2009).

¶ 56    We recognize that some cases have employed the abuse of discretion standard in appeals from fitness determinations. Typically, however, the issues presented in those cases arose from concerns about the manner in which the hearing was *conducted* rather than assessing the sufficiency of the evidence supporting the trial court's ultimate *finding* on the issue of fitness.

¶ 57    For example, a trial court's decision whether there is a *bona fide* doubt about fitness sufficient to trigger a hearing is reviewed under the abuse of discretion standard. *People v. Sandham*, 174 Ill. 2d 379, 382 (1996). Similarly, where a trial court merely "rubber stamp[s]" an expert's conclusion and fails to exercise judicial discretion and judgment, it may reflect an abuse of discretion. *Gillon*, 2016 IL App (4th) 140801, ¶ 21; see *Seymour v. Collins*, 2015 IL 118432, ¶ 50 ("When a court is required by law to exercise its discretion, the failure to do so may itself constitute an abuse of discretion ***."). Such cases are, however, the exception and not the rule. Because the supreme court has clearly established that fitness determinations are reviewed under the manifest weight standard, we do not agree with those cases holding that fitness determinations are "normally" reviewed under the abuse of discretion standard. See, *e.g.*, *People v. Contorno*, 322 Ill. App. 3d 177, 179 (2001); *Shaw*, 2015 IL App (4th) 140106, ¶ 25.

¶ 58    Turning to the instant case, we cannot agree with defendant that the trial court's rulings at issue were in any way discretionary and subject to review under the abuse of discretion standard. This is not a case in which the trial court simply accepted stipulations or "rubber stamped" an expert's conclusion. See *People v. Lewis*, 103 Ill. 2d 111, 116 (1984) (explaining the difference between proper and improper stipulations at a fitness hearing). The trial court conducted

a full evidentiary hearing where it received multiple conflicting expert reports, heard live testimony, received stipulated testimony, posed questions to the defense expert witness, observed the defendant's demeanor and ability to testify, and was faced with making credibility determinations. In spite of defendant's arguments the court's finding relied only on its observations of defendant during his testimony, as discussed, the nature of the restoration of fitness hearing in this matter removes it from the realm of cases where the court arguably failed to exercise its discretion, and we reject outright the contention that the trial court conducted a deficient hearing resulting in second-prong plain error. See *People v. Cook*, 2014 IL App (2d) 130545, ¶ 15 ("[W]here a trial court's finding of fitness is based not only on stipulations but also on its observations of the defendant and a review of a psychological report, the defendant's due process rights are not offended.").

¶ 59          Defendant's arguments here expose the nature of his real contention: that the trial court's decision *on the evidence* was wrong. He asserts that the court relied on the wrong evidence, failed to resolve inconsistencies in the evidence, and failed to find that the presumption of unfitness was adequately overcome by the evidence. At oral argument, defendant's appellate counsel conceded that the issues raised here do, in fact, extend to the trial court's ultimate determination of restored fitness. This is precisely the type of fact-laden trial court decision that should not be reviewed under the abuse of discretion standard.

¶ 60          We therefore proceed to address defendant's arguments to determine whether the trial court's judgment was against the manifest weight of the evidence.

¶ 61                                        2. *Determination of Fitness*

¶ 62          Defendant argues that the trial court "disregarded the plethora of evidence" that he was unfit while failing to address numerous falsehoods in his testimony.

¶ 63    Regarding the "plethora" of evidence presented at the restoration hearing showing defendant was unfit, in reality, the trial court was faced with conflicting expert reports and a defendant who testified with apparent competence, and without any obvious signs of psychosis, that he wished to be found fit to stand trial. In reviewing Dr. Killian's 2018 and 2019 reports, the main concern was that the severity of defendant's schizophrenia resulted in psychotic symptoms rendering him "incapable of communicating clearly and rationally with his attorney or anyone else." Further, a significant basis for Dr. Killian's findings was defendant's demeanor, behavior, and mannerisms when he was interviewed. However, on cross-examination, Dr. Killian admitted that the description of defendant's demeanor, behavior, and mannerisms in his reports differed from those displayed by defendant while testifying and that he was "surprised" defendant was able to testify so clearly. Defendant's demeanor and behavior on the stand were more closely aligned with the observations contained in Dr. Pan's report. The failure of defendant's testimony to demonstrate the type of symptoms identified in Dr. Killian's reports effectively undermined the foundation of the conclusion he was unfit. See *Bilyew*, 73 Ill. 2d at 302 (noting the trial court must analyze and evaluate the basis for the experts' opinion rather than merely relying on the ultimate opinions themselves).

¶ 64    Defendant also argues that the trial court failed to address the various inaccuracies in defendant's testimony. Initially, we note that a court is not required to make detailed findings regarding fitness. *Gipson*, 2015 IL App (1st) 122451, ¶ 29. Nonetheless, defendant testified he was not properly diagnosed in that he was not schizophrenic or mentally ill and that he was completely free from all hallucinations in the recent past. Clearly, defendant's testimony on these points is against the totality of the evidence, as all of the reports before the court concurred in the diagnosis of schizophrenia and noted varying degrees of hallucination.

¶ 65        Defendant attempts to craft his assertion that he was not mentally ill into an acceptance of that fact by the trial court. A review of the record provides no support for this contention. The court was acutely aware defendant suffered from a mental illness. Furthermore, the purpose of the hearing was not to affirm or reject the medical diagnosis of the specific condition that afflicted defendant, nor was it to resolve disputes between defendant and the experts regarding their diagnoses. See *Haynes*, 174 Ill. 2d at 226 (noting the diagnosis of mental illness does not in itself render a defendant unfit to stand trial). In this particular case, the court was tasked with determining whether defendant could communicate with defense counsel sufficiently to assist in his defense. Defendant's subjective beliefs about his mental health and the court's decision not to explicitly address them are insufficient to prove the court's determination was against the manifest weight of the evidence.

¶ 66        Though the descriptions of defendant's hallucinations in the experts' reports varied from nonexistent to severe, the United States Supreme Court has noted that "[m]ental illness itself is not a unitary concept." *Indiana v. Edwards*, 554 U.S. 164, 175 (2008). Rather, "[i]t interferes with an individual's functioning at different times in different ways." *Id.* Dr. Pan's report documents defendant seeing "orbs" as late as March 2021 but that he was not experiencing any other auditory or visual hallucinations and was not exhibiting the symptoms of psychosis documented in Dr. Killian's 2019 report. While defendant's claim that he had experienced no hallucinations since 2018 was incorrect, Dr. Killian agreed that "someone can have a lot of hallucinations and be fit to stand trial." See *Haynes*, 174 Ill. 2d at 226 ("[A] defendant may be fit to stand trial even though his mind is otherwise unsound."). More important than defendant's chronological documentation of his hallucinations was his ability to communicate while on the stand, which stands in stark contrast to Dr. Killian's 2018 and 2019 reports.

¶ 67            Defendant alleges his testimony that he complied with his antipsychotic medication regimen 80% of the time was another falsehood the court failed to resolve. However, defendant testified that his compliance with the antipsychotic medication was below that of his other medications. In fact, he testified that he would take the antipsychotic medication the least, not the 80% he claimed to take the other medication or as claimed in the briefing. Despite this lower than desired compliance, the court was still faced with a defendant who was able to communicate with counsel and articulate his position, as well as an expert report that supported the finding of fitness.

¶ 68            Defendant claims this case is similar to *Gipson*, 2015 IL App (1st) 122451, and *People v. Esang*, 396 Ill. App. 3d 833 (2009). In *Gipson*, however, the reviewing court was specifically concerned with the trial court's lack of interaction with the defendant and the fact the court did not pose questions concerning the interactions between defense counsel and the defendant. *Gipson*, 2015 IL App (1st) 122451, ¶ 36. The court in *Gipson* was also troubled by the trial court's failure to make clear how it had resolved conflicting opinions among the experts. *Id.* ¶ 35. Again, unlike *Gipson*, the court here did not rely solely on stipulations; it heard testimony from defendant and from Dr. Killian and was an active participant in the proceedings. While the court did not directly pose questions to defendant about the relationship or communications between counsel and defendant, those questions were asked by counsel for both parties and answered by defendant.

¶ 69            Further analogizing to *Gipson*, where the trial court stated the medical expert " 'could not rule out that [the defendant] was fit to stand trial' " (*id.* ¶ 36), defendant claims the trial court here also misapplied the presumption that follows an initial determination of unfitness. Defendant points to the following statement from the court:

"Dr. Killian said I guess he's presuming that the defendant is still hearing voices. I don't know how we would ever overcome presuming someone's hearing voices, since he feels that since he heard them in the past he must be hearing voices and those voices must be telling him how to answer questions to stay fit or to be found fit ***."

Unlike the trial court in *Gipson* that was openly misapplying the presumption, the court here was scrutinizing the assumption by Dr. Killian—who had not interviewed defendant in nearly two years—that defendant was still hearing voices. It was also necessary for the trial court to consider defendant's denial of having those same hallucinations and Dr. Pan's 2021 report, which stated that defendant suffered no other hallucinations except for seeing "orbs." The trial court's statement demonstrates its attempt to reconcile conflicting reports where defendant's behavior conformed to the description in one report (Dr. Pan's) but not the other. See *Mahaffey*, 166 Ill. 2d at 18 (finding the credibility and weight to be given psychiatric testimony are for the trier of fact to determine and the trial court did not err when there was ample expert evidence to support a finding of competency).

¶ 70 In sum, the record demonstrates that the trial court's judgment was not against the manifest weight of the evidence. Since there was no error, defendant's claim is not reviewable for plain error.

¶ 71 B. Self-Representation

¶ 72 Next, defendant contends that the trial court "incorrectly believed that [defendant] had an unfettered constitutional right to represent himself" in allowing him to proceed *pro se* regardless of compliance with the prescribed antipsychotic medications and his admission that he would acquiesce to Seraphin's guidance.

¶ 73    We begin by noting that defendant does not direct us to, nor have we found, anywhere in the record where the trial court expressed that defendant had an "unfettered" right to proceed *pro se*. The court did, however, inform defendant that he had a constitutional right to represent himself, which is a statement beyond reproach and supported by both the United States and Illinois Constitutions. U.S. Const., amend. VI; *Faretta v. California*, 422 U.S. 806, 819 (1975); Ill. Const. 1970, art. I, § 8; *People v. Simpson*, 204 Ill. 2d 536, 573 (2001). Further, a defendant who is fit to stand trial and who knowingly and voluntarily waives the right to counsel to proceed *pro se*, even if mentally ill, still receives a fair trial that comports with due process. *Godinez v. Moran*, 509 U.S. 389, 400-402 (1993). "Even where a defendant's decision to represent himself might be unwise, it must be honored out of respect for the individual." *People v. McNutt*, 2020 IL App (1st) 173030, ¶ 78.

¶ 74    Defendant's specific argument is that the trial court failed to "engage in the required analysis to determine if [defendant] had the mental capacity to waive counsel," citing *Edwards*, 554 U.S. at 177-178, as support. In *Edwards*, the United States Supreme Court was faced with the question of whether there was a constitutional violation where a defendant found competent to stand trial was required by the trial court to proceed with counsel due to incompetence to conduct the trial *pro se*. *Id.* at 167. The Court held that

> "the Constitution permits judges to take realistic account of the particular
> defendant's mental capacities by asking whether a defendant who seeks to conduct
> his own defense at trial is mentally competent to do so. That is to say, the
> Constitution permits States to insist upon representation by counsel for those
> competent enough to stand trial under *Dusky* [(*Dusky v. United States*, 362 U.S.
> 402 (1960) (*per curiam*))] but who still suffer from severe mental illness to the

point where they are not competent to conduct trial proceedings by themselves." *Id.* at 177-78.

¶ 75    However, this court has never held that *Edwards* mandates an additional line of questioning before allowing a defendant to proceed *pro se*. To the contrary, unless a defendant can demonstrate he "had a mental disability that incapacitated him from *understanding* the content of [Illinois Supreme Court] Rule 401(a) [(eff. July 1, 1984)], the sixth amendment (U.S. Const., amend. VI) required the court to honor his choice to represent himself, even if the choice was in all likelihood a disastrous one for the defense." (Emphasis added.) *People v. Fisher*, 407 Ill. App. 3d 585, 590 (2011) (citing *Ward*, 208 Ill. App. 3d at 1080, 1084). The United States Supreme Court has rejected the notion that

> "a defendant who waives his right to the assistance of counsel must be more competent than a defendant who does not, since there is no reason to believe that the decision to waive counsel requires an appreciably higher level of mental functioning than the decision to waive other constitutional rights." *Godinez*, 509 U.S. at 399.

¶ 76    Here, defendant was admonished in strict compliance with Rule 401(a). He was also given the *Ward* admonishments orally and in writing, and he was given the opportunity to consider the latter before appearing before the court again. At that later date, he was again admonished in strict compliance with Rule 401(a). Given the fact that defendant had already been found fit, we decline the opportunity to extend the holding of *Edwards* to require an additional finding of competence to waive counsel. Accordingly, once defendant was fit to stand trial and the trial court determined he knowingly and voluntarily waived his right to counsel, it was not required to conduct any additional inquiry before permitting defendant to proceed *pro se*. See, *e.g.*, *People*

- 23 -

*v. Rodriguez-Aranda*, 2022 IL App (2d) 200715, ¶ 50 ("*Edwards* is permissive rather than prescriptive: the trial court may deny a severely mentally ill person from representing himself, however, the trial court is not required to perform an additional inquiry regarding competency before allowing a defendant to represent himself."); *People v. Allen*, 401 Ill. App. 3d 840, 852 (2010) ("Nothing in *Edwards* requires a trial court to [engage in] the forced denial by the trial court of [the] defendant's right to proceed *pro se* although he was found mentally competent to stand trial.").

¶ 77    As more succinctly put by the Illinois Supreme Court in *Mahaffey*, decided prior to *Edwards* and which appears to remain good law:

> "Because we decline to disturb the trial judge's fitness finding, we must also reject the defendant's related contention that he was not competent to waive his right to counsel. Competence to waive counsel is measured by the same standard as competence to stand trial [citation], and the defendant's fitness for trial therefore also established his fitness to waive counsel." *Mahaffey*, 166 Ill. 2d at 19.

¶ 78                              III. CONCLUSION

¶ 79    For the reasons stated, we affirm the trial court's judgment.

¶ 80    Affirmed.

*People v. Finlaw*, 2023 IL App (4th) 220797

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Morgan County, No. 18-CF-143; the Hon. Jack D. Davis II, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Sarah G. Lucey, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Gray Noll, State's Attorney, of Jacksonville (Patrick Delfino, David J. Robinson, and Connor Goetten, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |