NOTICE

Decision filed 02/27/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240117-U

NO. 5-24-0117

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 21-CF-155 |
| | ) | |
| KYLE C. LOCKLEAR, | ) | Honorable |
| | ) | Ralph R. Bloodworth III, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Boie and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court did not err in finding defendant was restored to fitness based on the report of defendant's treatment team and a stipulation that the team would testify consistent with such report. Defense counsel did not provide ineffective assistance of counsel where defendant failed to show the necessary prejudice from the failure to file a motion to suppress.

¶ 2    Defendant appeals his convictions for home invasion, aggravated criminal sexual assault, residential burglary, and unlawful restraint. He argues that the trial court erred in finding him restored to fitness and that defense counsel provided ineffective assistance of counsel by failing to file a motion to suppress his statements made during two encounters with the police. For the following reasons, we affirm.

1

¶ 3                    I. BACKGROUND

¶ 4     On May 3, 2021, defendant was charged, through information, with four counts stemming from a break-in at Virgina Waddington's home at 11 Waddington Drive, Carbondale, Illinois, on April 30, 2021. However, on May 21, 2021, a grand jury indicted defendant on eight counts. Count I charged defendant with home invasion (720 ILCS 5/19-6(a)(2) (West 2020)) in that defendant knowingly entered into the dwelling of Virginia Waddington, remained there until he knew one or more persons were present in said dwelling, and intentionally injured Virginia. Count II also charged home invasion (*id.* § 19-6(a)(6)), alleging the same facts as count I with the additional allegation that defendant committed aggravated criminal sexual assault (*id.* § 11-1.30(a)(5)) against Virginia Waddington in said dwelling. Counts III through V charged defendant with aggravated criminal sexual assault (*id.*) in that he, by force or threat of force, knowingly inserted his finger into the vagina of Virginia, who was 60 years of age or older, three separate times. Count VI charged defendant with aggravated criminal sexual assault (*id.*) in that he, by force or threat of force, knowingly inserted his penis into Virginia's sex organ. Count VII charged defendant with residential burglary (*id.* § 19-3(a)), in that defendant knowingly and without authority remained in Virginia's dwelling with the intent to commit a theft therein. Count VIII charged defendant with unlawful restraint (*id.* § 10-3(a)) in that he knowingly and without legal authority detained Virginia through force or threat of the imminent use of force by holding her inside a bedroom of her home and threatening to physically injure her if she called for help.

¶ 5     On August 9, 2021, defense counsel filed a motion to appoint an expert to evaluate and determine defendant's fitness to stand trial and sanity at the time of the offense. The motion alleged that counsel had a *bona fide* doubt as to defendant's fitness to proceed and his sanity at the time of

2

the offense. Counsel alleged that the *bona fide* doubt as to defendant's fitness stemmed from privileged conversation.

¶ 6       On August 28, 2021, over the State's objection, the trial court found a *bona fide* doubt as to defendant's fitness to stand trial, as well as the possibility of the affirmative defense of insanity. It therefore appointed Dr. Fred Klug to examine defendant. 725 ILCS 5/104-11(a) (West 2020).

¶ 7       On September 23, 2021, Dr. Klug's report was filed. The report stated that defendant was oriented to person and place but not time. Defendant was easily distracted by his tangential thought process, and his demeanor was unstable and disorganized. His predominant mood was erratic and restless. Defendant's cooperation and effort with testing were marginal because he had difficulty focusing on the topic at hand. Dr. Klug indicated that the results of his examination and testing were a reasonable estimate of defendant's functioning. Dr. Klug noted that defendant often exhibited long pauses before responding, but not all of his pauses were limited to responses relevant to fitness questions. Defendant reported that he could not remember many things in his life and drugs made him feel better, specifically referring to cocaine and methamphetamine. He averred that he used methamphetamines the week prior to his arrest. No hallucinations were noted or reported, although defendant mentioned he was previously diagnosed with schizophrenia. Dr. Klug averred that while no overt psychotic or organic processes were evident, defendant's rambling speech was significant. According to the medical intake by the jail nurse, defendant had no current or past medical illnesses, except for a broken right arm. His medications were trazodone (antidepressant), Depakote (anticonvulsant often used as a mood stabilizer), Benadryl (antihistamine), and clonidine (hypotensive agent). Dr. Klug reported there was no overt evidence of malingering. Defendant's intellectual abilities operated in the borderline range of functioning.

¶ 8    The results of the competency screening test and the Georgia Court Competency Test-MSH Revision suggested incompetency. In the report, Dr. Klug stated, "He did not describe a judge's role in a trial, because he 'forgot his name.' He didn't remember any witnesses, so he couldn't describe what they do. He didn't know what the juries do because he's 'never been to a jury.' " Dr. Klug also noted that defendant did not understand the adversarial nature of a trial, specifically not understanding that there were two opposing attorneys. When Dr. Klug stated defendant could help his defense by remembering what happened, defendant referred to being on medications for a long time and complained that they scrambled his brain. Defendant could not remember the formal charges but said, "They say I did something to some old lady."

¶ 9    Under the section titled "Axis I," Dr. Klug diagnosed defendant with methamphetamine use disorder, cocaine use disorder, and alcohol use disorder. He further noted "rule out stimulant induced bipolar disorder" and "rule out substance induced neurocognitive disorder." The "Axis II" diagnosis was "deferred." Dr. Klug concluded that given defendant's difficulty in maintaining focus, it would be more than a little difficult for defense counsel to rely on defendant for assistance in his defense. Therefore, Dr. Klug opined defendant was unfit to stand trial but could be restored to fitness within the statutory limit of one year with the assumption that neurocognitive disorder could be ruled out or ameliorated.

¶ 10    At the October 1, 2021, status hearing, defense counsel averred that Dr. Klug filed his report. The State, however, requested additional time to allow Dr. Klug to file a supplemental report after listening to some of defendant's jail phone call recordings that the State believed were relevant in determining defendant's fitness. The trial court agreed and granted the State's request.

¶ 11    On October 18, 2021, Dr. Klug's addendum was filed. The addendum noted that since Dr. Klug's initial report, he reviewed 36 of defendant's recorded phone conversations from August

4

12, 2021, to September 15, 2021, while defendant was incarcerated in Jackson County jail. He also reviewed a nearly five-hour recorded video of defendant's police interrogation.

¶ 12   The addendum further stated that Dr. Klug again evaluated defendant on October 4, 2021. At that time, defendant's attention span deteriorated and he became distracted by his tangential thought process. His demeanor became unstable and disorganized. His predominant mood was fear, and he became erratic and restless. No dysarthria, idiosyncratic words, neologisms, or paraphasia were expressed. No hallucinations, delusions, or obsessions were reported. Dr. Klug stated that while no overt psychotic or organic processes were evident, defendant's rambling and fast speech was significant.

¶ 13   Dr. Klug again noted there was no overt evidence of malingering. Defendant's responses to questions regarding the trial court proceedings were less informative than that in the first session. When reminded that defendant referred to "due process" in a phone conversation, defendant replied that his cellmate told him of that term, and then defendant changed topic of conversation by referring to a previous question asked by Dr. Klug. Dr. Klug stated that defendant tended to latch on to an earlier question and revert back to that question when stressed and or confused. Defendant could not explain "fitness" in his own words, even after Dr. Klug explained the term. Dr. Klug noted that defendant was prone to interrupt and usually stated things that were unrelated to the current conversation or question. Dr. Klug diagnosed defendant with methamphetamine use disorder, cocaine use disorder, and alcohol use disorder. In the diagnosis section, Dr. Klug further stated, "rule out stimulant induced bipolar disorder" and "diagnosis deferred."

¶ 14   The addendum then listed the relevant statements defendant made in the recorded jail telephone calls and Dr. Klug's analysis as to each. With respect to defendant's statement that he could not discuss his case because the conversation was being recorded, Dr. Klug rejected the

conclusion that this statement was evidence that defendant knew the State could use any information provided in the telephone call against him. Dr. Klug explained that defendant simply restated the announcement provided at the beginning of each jail phone conversation, which stated that the conversation was not private, recorded, and may be monitored. Dr. Klug stated defendant repeating this announcement did not necessarily mean he had a deep knowledge of the inner workings of the legal system. Regarding defendant's use of the phrase "innocent until proven guilty" in various phone conversations with different people, Dr. Klug stated that such statement reflected defendant's knowledge of this specific right but did not conclusively establish defendant was fit to stand trial by itself. Dr. Klug took defendant's requests that the person on the other side of the phone either sweet talk the state's attorney or court or tell Dr. Klug that defendant was crazy as defendant realizing the seriousness of his charges. However, Dr. Klug did not believe such requests reflected defendant's understanding of fitness. Dr. Klug found the most significant information to indicate defendant had some understanding was defendant talking about a plea offer during phone conversations with his mother and father. Dr. Klug found this even more significant considering that defendant had an attorney to make a counteroffer, but Dr. Klug did not find this was conclusive by itself. With respect to defendant's reference to "due process" in discussing another inmate's problems with visitation, Dr. Klug found defendant's statements suggested superficial knowledge about the legal system but did not speak to the depth of defendant's knowledge, especially about fitness.

¶ 15    Dr. Klug concluded that based on defendant's jail telephone conversations, defendant appeared to have a partial understanding of these proceedings. However, Dr. Klug stated, "When discussing the aspects of his case, his emotional state (fear and agitation) interferes with attempts to elicit any adequate knowledge he has about the proceedings." Dr. Klug cited his initial report,

6

noting that given the difficulty of keeping defendant focused and defendant's rambling, it would be difficult for an attorney to rely on him for assistance in his defense. Dr. Klug was also again encouraged that defendant could be restored to fitness within the statutory limit of one year.

¶ 16 Dr. Klug found defendant's telephone conversations further supported his belief that defendant could be restored to fitness where defendant often had a normal rate of speech with coherent thoughts and goals, was patient, and repeated information the listener needed. Dr. Klug also noted that only when the listener contradicted defendant, accused defendant of something, refused a favor or request, or interrupted defendant, did he become emotionally aroused and begin to ramble, speak loudly, speak quickly, and interrupt.

¶ 17 Dr. Klug did not believe defendant's behavior indicated malingering. He explained defendants with hidden agendas typically had a distorted idea that a finding of unfitness was the equivalent to an insanity finding. Defendant did not verbalize such agenda. Dr. Klug acknowledged there were no absolutes, but defendant's rambling and his tangential thought process were present in conversations unrelated to his case. Dr. Klug again opined that defendant was unfit to stand trial but could be restored to fitness within the statutory limit of one year. Dr. Klug stated defendant needed treatment that would reduce his sympathetic nervous system arousal and help him focus on the topic being discussed.

¶ 18 On November 8, 2021, the trial court and parties noted that Dr. Klug's addendum was received. The State noted its belief that defendant's jail telephone calls provided sufficient evidence that defendant was malingering. It specifically noted that in one call, defendant told his parents to say that he was crazy if asked, and in another phone call, he stated he would like to hire "a real paid attorney." However, the State conceded "the quickest way forward for us to be able to move forward for the victim is to accept reluctantly the addendum that was provided by Dr. Klug."

7

The State further averred that Dr. Klug "would like to visit the defendant on a weekly basis for up to 60 days and provide another evaluation to the Court." The State clarified that it wanted the record to reflect it "reluctantly" stipulated to the addendum and would like a reevaluation within 60 days as well as Dr. Klug's weekly visits.

¶ 19    Defense counsel took issue with the State's implication that defendant's mental issues were some type of ploy. She stated that she did not object to Dr. Klug submitting another report in 60 days but requested defendant be transferred to a mental health facility as soon as a bed was available.

¶ 20    The trial court noted it considered the parties' arguments and the stipulation that if called, Dr. Klug would testify consistently with his reports. The trial court found that at that time, defendant was not fit to stand trial but there was a reasonable likelihood that he could be made fit within the statutory period of one year. It remanded defendant to the care and custody of the Illinois Department of Human Services (IDHS) for further care and evaluation. It set the matter in 45 days to ensure defendant was transported to a facility or that Dr. Klug completed follow-up visits. There were no further reports from Dr. Klug.

¶ 21    On January 5, 2022, a letter drafted by IDHS was filed. The letter stated an individualized placement evaluation for defendant was completed on December 17, 2021, and the results suggested that defendant remained unfit to stand trial. IDHS determined Alton Mental Health Center was the most appropriate inpatient setting for defendant, but due to Executive Order No. 2020-24 (Apr. 10, 2020) in response to the COVID-19 pandemic, all admissions to the IDHS forensic treatment programs were temporarily suspended with limited essential transfers at the sole discretion of the IDHS secretary. The letter further noted that once approved for admission, a clinical opinion and treatment plan would be rendered and reported to the trial court.

¶ 22 Defendant was admitted into Alton Mental Health Center on February 17, 2022. On March 29, 2022, an IDHS 90-day fitness to stand trial progress report was filed. The IDHS report noted defendant was superficially cooperative, but suspicious. He often gave guarded or evasive answers and questioned whether information revealed during his treatment there could be used in his case. Defendant did not otherwise overtly make paranoid statements or have hallucinations during the evaluation. He was oriented to person, place, time, and somewhat situation. Defendant was taking divalproex for mood instability, quetiapine for psychosis, and clonidine for residual adult ADHD.

¶ 23 The IDHS report stated that despite periods of calm behavior and fairly even demeanor, defendant continued to have occasional bouts of hostile affect and demanding behaviors. Defendant had threatened other patients and staff, destroyed facility property, kicked and resisted staff, fought with another patient, and cursed. These negative behaviors tended to be associated with feeling thwarted in his requests/demands or being contradicted by staff. Despite residual complaint of auditory hallucinations/pseudohallucinations, staff did not observe defendant to be easily distractable or actively responding to internal stimuli. The report further stated psychologist Dr. Randolph Parks administered a personality assessment screener, which was a standard personality test, on March 23, 2022. Dr. Parks reported that the results of test were consistent with malingering psychiatric symptoms and cognitive impairment. Dr. Parks opined "he is greatly exaggerating the magnitude of his psychiatric symptoms." In support of his conclusion that defendant malingered cognitive impairment, Dr. Parks noted defendant initially tested mildly impaired on the Mini-Mental Status Examination but his performance on the same test two days later was within normal limits. Dr. Parks reported that it was "not credible that [defendant] does not remember what he has actually been charged with, since his performance on the memory

portion of testing was adequate." Dr. Parks further stated that defendant was an impulsive person and recommended a structured environment when discharged.

¶ 24    The IDHS reported that while defendant maintained prolonged periods of self-control, he remained prone to episodes of anger and hostility, especially when he felt slighted or wronged by others. Defendant also sometimes attempted to manipulate situations by focusing on the perceived wrongs and presented an attitude of self-righteousness or entitlement. There were no unusual or bizarre posturing/gesturing typical of catatonia. No looseness of associations was observed. While defendant continued to endorse residual auditory hallucinations/psuedohallucinations and transient feelings of *déjà vu*, no active delusions of persecution, grandiosity, or of somatic content were elicited. The reported further noted that defendant's memory was globally intact, but he continued to endorse limited recollection of his alleged offense.

¶ 25    The IDHS report primarily diagnosed defendant with substance-induced bipolar disorder, with onset during intoxication. As secondary diagnoses, the report listed malingering, methamphetamine use disorder, cocaine use disorder, alcohol use disorder, cannabis use disorder, opiate use disorder, antisocial personality disorder, and ADHD. Based on Dr. Parks's testing on March 23, 2022, which indicated defendant malingered his psychiatric and cognitive symptoms, the Alton Mental Health Center treatment team opined that within a reasonable degree of psychiatric certainty, defendant was fit to stand trial.

¶ 26    On April 1, 2022, the trial court filed an immediate transport order that stated it "received a report from the supervisor of the defendant's treatment team pursuant to 725 ILCS 5[/]104-15(a)(2) that the defendant is FIT TO STAND TRIAL." It ordered the immediate return of defendant to the custody of the Jackson County jail.

10

¶ 27    At the May 5, 2022, status hearing, the parties agreed they received the IDHS report. Both parties stipulated that if called, the doctors and treatment teams would testify consistently with the IDHS report. Although given the opportunity, counsel did not present further evidence or argument. The trial court held:

> "Let the record reflect the Court has considered the evidence, the stipulations of the parties, that if called, the treatment teams, professionals contained in the report *** would testify consistent with the opinions, information contained within the report and the opinions expressed within the report.
>
> Based upon the same and the evidence, the Court at this point in time will find that [defendant] is fit to proceed for trial in this matter ***."

¶ 28    On February 27, 2023, the State requested to dismiss counts IV and V and proceed to trial on the remaining counts. The trial court granted the State's oral motion to dismiss counts IV and V, and the parties then proceeded to *voir dire*.

¶ 29    On February 28, 2023, prior to the jury being sworn in, defendant elected a bench trial. Evidence of the following was provided at trial.

¶ 30    The only eyewitness to the crime was the victim, Virginia Waddington, who testified that on April 30, 2021, she had fallen asleep on her couch and woke up around 11 p.m. She headed to her bedroom, and as she reached her door but before she touched the light switch, a man hit her in the side of her head. He got on top of her and tried to have sex with her. She knocked over a table that had a lamp on top, but it did no damage to the assailant. He picked her up and put her on the bed. When she screamed, he smothered her with a pillow and threatened to kill her if she did not remain quiet. He then tried to put his penis in her. Virginia stated he was not very successful because his penis was not hard. She said she felt him inside her a little bit but not fully. Defendant

11

also used his fingers to penetrate her. Virginia stated that throughout this time, defendant was naked and only had his shoes on.

¶ 31    Virginia further testified that at one point, defendant went to her bathroom and brought back lotion. He rubbed the lotion on her and himself and tried to put his penis in her again. When it did not work, he got frustrated and began to smoke a pipe. In doing so, defendant used a flashlight and a lighter. When his face lit up from the flame of his lighter, Virginia realized the assailant was a man that came to her door in January 2021. At that time, defendant asked Virginia's permission to go onto her property in an attempt to find a phone he said that he lost. Virginia allowed him. Defendant went to the back of her property and ended on her neighbor's property.

¶ 32    She stated around 5 a.m., defendant rolled off Virginia's bed, got dressed, and walked down the hall. She scooted herself down the hallway to the living room, where she had a phone to call for help. She further discovered her purse and another phone was missing.

¶ 33    Virginia suffered significant bruising on her left eye, and blood around her mouth and in her hair. Virginia also had at least one loose tooth, bruises on both wrists and arms, as well as bruising, swelling, and a tear to her right elbow. She was transported to a hospital, where a sexual assault nurse examiner (SANE) examined her. In completing the examination, the SANE nurse took swabs of Virginia's right cheek, neck, vagina, and anus.

¶ 34    The State also presented the testimony of several law enforcement officers involved in the investigation of these offenses and the January 2021 incident. Law enforcement discovered Virginia's purse and phone near the arboretum. Virginia's house was within walking distance of the arboretum, but the path between the two required walking through a heavily wooded and thorny area.

¶ 35    Police observations of Virginia's home included a broken window in Virginia's bedroom, which allowed the window to open freely. A pair of garden shears were also located on the ground under the window. Officers described the bedroom as being in disarray, with one officer noting that a table was overturned with a broken leg. Blood was on the bedding and on several garments throughout the bedroom. An officer found a piece of mail on the floor of Virginia's bedroom, which was addressed to 303 Willow Street.

¶ 36    Law enforcement collected swabs of the blood on the bed and on the floor in Virginia's bedroom. They also discovered three lotion bottles in Virginia's home. One viable fingerprint for comparison was present on one bottle. Law enforcement was also able to obtain a friction ridge lift fingerprint off of the interior side of the storm door that led outside the back of the home.

¶ 37    Virginia informed the police that the assailant was the man who asked to be on her property in January 2021. She described defendant as wearing a red shirt and plaid shorts. Virginia also told police that the assailant had little to no body hair.

¶ 38    When officers first tried to make contact with defendant at 303 Willow Street on May 1, 2021, defendant ran out of the back door. Defendant called the police later that day to ask why they wanted him. Defendant also informed them that he always ran when he saw the police. He declined the officer's invitation to be interviewed.

¶ 39    Police eventually arrested defendant on May 2, 2021. An officer found on defendant's person a flashlight, some snips, earbuds, a torch lighter, and a broken glass methamphetamine pipe. Police interviewed defendant. The video of the interview was admitted into evidence. During the course of the interview, defendant was inconsistent and made misstatements. Defendant stated several places that he was located on April 30, 2021—all of which were within a half of mile from Virginia's house—including the arboretum. He also admitted to living at 303 Willow Street and

13

smoking methamphetamine to allow him to have sex for longer durations but stated it also prevented him from being able to ejaculate. Defendant eventually invoked his right to an attorney and the interview ended.

¶ 40    When the officers executed a search warrant for defendant's DNA on May 3, 2021, defendant began to again talk about the case. Officers stated that despite warning defendant that he invoked his right to an attorney and was not being interviewed, defendant implied that he was at Virginia's house and had her tools but did not do anything sexual. In align with the search warrant, law enforcement attempted to take a pubic hair sample and discovered defendant had little to no body hair. Defendant also had scratches on his neck, upper chest, and legs.

¶ 41    Melissa Gamboe, forensic scientist at the Illinois State Police Metro East Forensic Science Lab, analyzed the fingerprint evidence and opined that defendant left the fingerprint on the lotion bottle and the fingerprint lifted from the storm door. Suzanne Kidd, forensic scientist at the Metro East Forensic Science Lab, tested the DNA evidence in the case. Kidd testified that Virginia and defendant's DNA could not be excluded from the swab of blood—with possible other mixed fluids—taken from the bed. She explained, "therefore, they are included as sources of the DNA." Kidd estimated she would see that DNA profile in one in three trillion unrelated individuals. Kidd further opined that defendant could not be excluded as the source of the male DNA found in the swab of Virginia's neck, to the degree of 2.6 billion unrelated individuals, and of the male DNA found in the swab of Virginia's cheek, to the degree of 73 million unrelated individuals. Male DNA was also present in Virginia's vaginal swab, but the female-to-male DNA ratio prevented further testing. No male DNA was present in Virginia's anal swab.

¶ 42    Virginia's neighbor, Steven Hammett, testified that on January 6, 2021, he called the police regarding an unknown vehicle driving down their private, rural cul-de-sac. The unknown vehicle

14

went down their road, a man got out, and the truck parked at the end of the driveway. Hammett took a picture of the man who got out of the vehicle and was by Virginia's house. He identified the man as defendant.

¶ 43 Deputy Sheriff Erica Hunter of the Jackson County Sheriff's Office testified that she worked on January 6, 2021, and confirmed that she responded to reports of trespassing in Virginia's neighborhood. During her investigation, she discovered Eddie Lewis drove defendant to the area and defendant stated that he was walking around to find his phone.

¶ 44 When the State called Lewis to the stand to testify, defendant stated, "I have a question, Judge. I don't know how he can testify against me when I made him thousands of dollars, you know, just driving me." The trial court interrupted defendant and the proceedings continued.

¶ 45 Through the testimony of Lewis and two people connected to Orlen Sims, the State presented evidence that Lewis and defendant were friends with Orlen Sims, who was the owner of the home at 303 Willow Street. Defendant often visited and stayed with Sims. Home security video footage of inside of Sims's home on April 30, 2021, showed defendant wearing a red shirt.

¶ 46 The State also admitted two of defendant's recorded jail phone calls. In the phone calls, defendant stated that he was at the victim's home to "get some cash" but did not do "that other stuff." When asked why Sims's mail was discovered at Virginia's home, defendant stated that he must have put the mail in his pocket to give the address to another friend and dropped it. The State further provided testimony from a jail guard and the victim's niece that defendant mouthed "I'm sorry" to Virginia during a deposition at the courthouse.

¶ 47 The trial court found defendant guilty of all counts. On December 13, 2023, defendant filed a motion for a new trial pursuant to section 116-1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-1 (West 2022)) and for judgment of acquittal notwithstanding the verdict. The motion

argued the State failed to prove defendant guilty of each offense beyond a reasonable doubt, certain testimony should have been barred, the trial court erred in granting the State's first motion *in limine* and denying defendant's motions *in limine*, and the trial court erred in denying defendant's motion for a direct verdict.

¶ 48    On December 15, 2023, the trial court held a hearing on posttrial motions and sentencing. The trial court denied the posttrial motion and proceeded to sentencing. Before the State could present evidence, defendant interrupted, stating he did not "physically" do this, but he felt sorry for Virginia. Over the protest of defense counsel to stop talking, defendant continued. He felt the trial court had already made its mind up about defendant, re-asserted his innocence, and argued he had family support and was not a murderer. Defendant also stated that he knew he would be sentenced to prison. He noted that there "might be a re-election coming up and whatever it may be and you have to give this family justice." During the State's argument, defendant again interrupted, claiming the State made a misstatement. After defense counsel provided argument, defendant made a statement in allocution. He maintained his innocence but still asked for forgiveness and explained he used drugs to avoid being dependent on medication. He also stated that he was always employed and had three kids who depended on him,

¶ 49    The trial court merged counts II and VII with count I and sentenced defendant to 29 years' imprisonment for count I. It sentenced defendant to 34 years' imprisonment for count III and 36 years' imprisonment for count VI. The sentences for counts III and VI were to run consecutively to count I. For count VIII, the trial court sentenced defendant to six years' imprisonment, to run concurrently with count I.

16

¶ 50    On December 20, 2023, defendant filed a motion to reconsider. On January 4, 2024, the trial court entered an order denying defendant's postsentencing motion. Defendant timely appealed.

¶ 51                                    II. ANALYSIS

¶ 52    On appeal, defendant raises two issues: (1) whether the trial court improperly relied solely on the conclusions of the IDHS evaluators in finding defendant was restored to fitness and (2) whether trial counsel was ineffective for failing to move to suppress defendant's statements during his police interview or when the officers executed the DNA warrant. We address each in turn.

¶ 53              A. Trial Court's Order Finding Defendant Restored to Fitness

¶ 54    Defendant first contends reversal is required where the trial court failed to use its discretion in finding defendant restored to fitness by relying solely on an improper stipulation from the parties. He contends that the stipulation—itself—was improper where the language was vague and revealed little about whether the trial court meant to stipulate to the fact of defendant's fitness or to the experts' opinion on fitness. Additionally, defendant argues that even assuming, *arguendo*, that the stipulation looks like it is in the proper format, it is clear from the rest of the hearing that the trial court rendered its opinion that defendant was restored to fitness based solely on the IDHS report's conclusions. He further asserts that the record does not reflect that the trial court reviewed the entire report. He notes that despite the record lacking any indication that defendant received treatment prior to being admitted at Alton Mental Health Center, he was found fit and malingering only five weeks after being admitted. He further complains that despite the direct contradiction between Dr. Klug's reports finding defendant unfit and the IDHS report finding that he was

17

malingering, and without any information whatsoever as to what warranted this change, the trial court made no inquiry when it found defendant was fit.

¶ 55 Defendant acknowledges these issues are forfeited where he did not raise them in the lower court. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, he contends due to the fundamental nature of the right to be fit for trial, this court may consider the inadequacy of the restoration hearing under the doctrine of plain error. *People v. Cook*, 2014 IL App (2d) 130545, ¶ 13; *People v. Sandham*, 174 Ill. 2d 379, 382 (1996). We agree.

¶ 56 Plain-error review allows this court to consider a forfeited error when

"(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

"The second prong of plain error review is equivalent to reviewing for structural error, requiring automatic reversal where the error serves to erode the integrity of the judicial process and undermine the fairness of a defendant's trial." *People v. Finlaw*, 2023 IL App (4th) 220797, ¶ 47.

¶ 57 "[T]he right to be fit for trial is 'fundamental' and 'prosecuting a defendant whether there is a *bona fide* doubt as to that defendant's fitness renders the proceeding fundamentally unfair.' " *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 50 (quoting *Sandham*, 174 Ill. 2d at 382). Defendant's fitness issues are therefore reviewable under second prong plain error. *Id.*; *Sandham*, 174 Ill. 2d at 382; *Finlaw*, 2023 IL App (4th) 220797, ¶ 47; *People v. Johnson*, 2024 IL App (5th)

18

220608-U, ¶ 16; *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 28. For relief, however, defendant must first show error occurred. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 58    The due process clause bars prosecution of a defendant who is unfit to stand trial. *People v. Holt*, 2014 IL 116989, ¶ 51. "A defendant is presumed to be fit" but will be deemed "unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104-10 (West 2022). "Fitness" relates only to a person's ability to function in the legal proceedings, and "a defendant may be fit to stand trial even though his mind is otherwise unsound." *People v. Haynes*, 174 Ill. 2d 204, 226 (1996).

¶ 59    Once a defendant is adjudicated unfit to stand trial, as in this case, the defendant is presumed unfit until adjudicated to be fit at a subsequent fitness hearing. *Gipson*, 2015 IL App (1st) 122451, ¶ 29. The trial court must reexamine the fitness issue no more than 90 days after it first ordered treatment to restore defendant to fitness. 725 ILCS 5/104-20(a) (West 2022). We reverse a court's fitness determination only if it is against the manifest weight of the evidence. *Haynes*, 174 Ill. 2d at 226.

¶ 60    Defendant contends that the stipulation itself was improper and the trial court's sole reliance on the stipulation was error. We disagree.

¶ 61    The Illinois Supreme Court, in *People v. Lewis*, 103 Ill. 2d 111, 112 (1984), addressed whether, "following a finding that an accused is not fit to stand trial, a later finding of fitness may be based on stipulated evidence." In answering that question, the court distinguished between a stipulation agreeing to the fact that a defendant is fit, and therefore accepting the expert's opinion as true, versus a stipulation agreeing to the contents of an expert's opinion on defendant's fitness. *Id.* at 115-16. It held the latter was proper for the trial court to consider in determining the

defendant's fitness. *Id.* at 116. The court further held that if presented with a stipulation to an expert's report regarding a defendant's fitness, the trial court "could find defendants fit, seek more information, or find the evidence insufficient to support a finding of restoration to fitness." *Id.*

¶ 62 Here, the parties specifically stipulated that IDHS doctors and treatment teams would testify consistently with their report and the findings and opinions contained therein. Because the stipulation spoke to the asserted testimony of defendant's IDHS treatment team and was not an agreement to an ultimate legal or medical conclusion, the stipulation was proper under *Lewis*.

¶ 63 While a stipulation of an expert's opinion of the defendant's fitness is a proper consideration, the ultimate issue of the defendant's fitness is for the court to determine. *Id.* Relying exclusively on the parties' stipulation to find a defendant unfit violates due process, but due process is satisfied if the court's determination was based on more than the stipulation, such as its independent review of "the expert's report or its own observations of the defendant." *People v. Smith*, 2017 IL App (1st) 143728, ¶ 86.

¶ 64 Defendant contends this case is similar to *People v. Gillon*, 2016 IL App (4th) 140801, where the appellate court reversed a trial court's finding that the defendant was restored to fitness based on solely on a stipulation to the IDHS preplacement report. In *Gillon*, defense counsel raised a *bona fide* doubt as to defendant's fitness, defendant was evaluated, and after a fitness hearing, on May 5, 2014, the trial court found defendant unfit to stand trial. *Id.* ¶¶ 6-8. Subsequently, IDHS filed a report on May 16, 2014, stating that a licensed social worker completed a preplacement evaluation of defendant and found defendant was fit to stand trial. *Id.* ¶ 9. The trial court held another fitness hearing, and the parties stipulated to the report but did not present further evidence or argument. *Id.* ¶ 10. The trial court accepted the parties' stipulation to the report, stating:

20

" 'I have considered that report. It is the determination of the professionals working with [defendant] that he's now fit to stand trial, so I do find that he's able to assist in his own defense, understands the nature and purpose of the proceedings, and fit to proceed to trial or plead, able to help his attorney as well.' " *Id.* ¶ 25.

¶ 65 The appellate court reversed and remanded the case for a new fitness hearing. It found the specific circumstances of the case "gave rise to pivotal concerns questioning defendant's fitness." *Id.* ¶ 26. It determined the trial court should have inquired as to how or why defendant gained fitness in a matter of days between the trial court's initial finding of unfitness and the IDHS pre-evaluation report, particularly where defendant had not yet been treated. *Id.* ¶ 28. It also found "in this particular case, the social worker's decision restoring defendant to fitness required the [trial] court to perhaps perform a more thorough analysis than otherwise necessary if presented with an opinion from a psychiatrist or psychologist." *Id.* ¶ 29. The *Gillon* court also noted that defendant's behavior in the proceedings after he had been found restored to fitness raised another *bona fide* doubt of his fitness, which put the trial court and parties on notice as to whether the IDHS's opinion was correct. *Id.* ¶ 30. Due to these considerations and the cumulative effect thereof, the appellate court found the trial court erred in accepting the parties' stipulation that the defendant's fitness had been restored. *Id.* ¶ 31.

¶ 66 The case before us does not present all the same considerations as *Gillon*. Here, the IDHS agreed that defendant was unfit after its placement evaluation. Only after defendant was observed and received treatment did IDHS find defendant fit to stand trial. While those treatments were not described with great detail, the treatments were listed for the trial court's consideration. Although not as lengthy as Dr. Klug's report, the IDHS report further provided the testing and reasons that led to its diagnosis of malingering. The IDHS report also was approved by a doctor and the test

21

suggesting malingering was administered by a psychologist, rather than a social worker as seen in *Gillon*.

¶ 67 Defendant's actions subsequent to the finding of him being restored to fitness also did not raise another *bona fide* doubt as to his fitness or concern that the IDHS report may have been incorrect. Defendant interrupted the proceedings several times. One interruption at trial involved defendant questioning whether Lewis could testify against him when he made Lewis money. Defendant's other interruptions included him clarifying his previous statements, interjecting a related fact during a witness's testimony regarding when they met, and asking another witness a question. He also interrupted the State's closing argument to say, "this is not me." Defendant also made one proper interruption at trial when he asked to speak with his attorney. His outbursts were more persistent during the sentencing hearing, but each outburst concerned defendant maintaining his innocence, expressing how sorry he was for the victim, or stating that he already knew the trial court would sentence him to prison.

¶ 68 While his question at trial regarding whether Lewis could testify if defendant made him money relates to defendant's knowledge of the proceedings, this statement alone did not raise a *bona fide* doubt that defendant could not understand the proceedings or help in his defense. Defendant's interruptions at trial were brief and pertained to the evidence or argument being presented. While defendant persisted in speaking during his sentencing hearing after being warned to stop talking, we find these interruptions were nothing more than the frustration that can occur when facing a finding of guilt, rather than an indication that defendant did not understand the legal process or could not help in his defense. Indeed, defendant's request to speak to his attorney and expectations of the sentencing hearing demonstrated proper understanding of the proceedings. These interruptions were not as severe as the uncontrollable outbursts that led to the defendant's

22

removal from court in *Gillon*. Given that the unique considerations that drove the *Gillon* court to reverse are not present here, we find it is not persuasive or dispositive.

¶ 69    Defendant nevertheless contends the trial court could not have relied on the IDHS report because the trial court did not inquire into the conflict between the two reports and left many questions unanswered. He argues unlike *Lewis*, the report here did not provide enough detail to qualify as a replacement for testimony such that it would have been inappropriate for consideration without inquiry. We disagree.

¶ 70    First, there is no indication that a detailed report was filed for the defendant in *Lewis*. See *Lewis*, 103 Ill. 2d at 113-14. Rather, the disposition only mentions the stipulation provided and that the trial court considered the stipulation in finding the defendant fit to stand trial. See *Id.* Without mentioning the details of any report, *Lewis* held that a trial court could find a defendant fit based on a stipulation to the opinion testimony which would have been given by the psychiatrists and observing defendant. *Id.* at 116. That is exactly what occurred here.

¶ 71    Moreover, while Dr. Klug's report conflicted with the IDHS report in that one found defendant unfit and the other found him malingering, we do not find such conflict meant Dr. Klug would have disagreed with the IDHS report. The two reports and evaluations were conducted at different times. The IDHS report was completed long after Dr. Klug's evaluations and after defendant received at least five weeks of treatment. Contrary to defendant's belief, the IDHS report did not say defendant malingered since he was charged; it simply stated he was malingering. Moreover, although Dr. Klug believed defendant was not malingering at the time of his report, he did not foreclose such possibility with certainty. We further note that even if the reports contradicted each other, the trial court was free to place more weight on one report over another.

23

*Haynes*, 174 Ill. 2d at 231 ("The credibility and weight to be given to psychiatric testimony are for the trier of fact to determine.").

¶ 72    The trial court did not simply accept the stipulation and found defendant restored to fitness, but rather noted it considered the stipulation and "evidence." The only evidence other than the stipulation was the report itself and any observations the trial court made. "[W]e are aware of no statute or supreme court rule that requires trial courts to either independently question a defendant or make express findings of fact regarding fitness." *People v. Goodman*, 347 Ill. App. 3d 278, 287 (2004). Accordingly, we find under the circumstances of this case, the trial court did not err in finding defendant restored to fitness. Because there is no error, defendant failed to establish plain error.

¶ 73        B. Counsel's Failure to File a Motion to Suppress Defendant's Statements

¶ 74    Defendant next contends that counsel was ineffective for failing to file a motion to suppress his statements made during his police interview and while the police executed a DNA warrant. As the bases to require suppression of defendant's statements during the police interview, defendant asserts the officers dismissed the *Miranda* warnings as a technicality, the officers did not ensure defendant understood the *Miranda* warnings, defendant was clearly mentally ill and confused at the time of the police interview, and defendant was under the influence of methamphetamine. Regarding the suppression of his statements made during the execution of the DNA search warrant, defendant argues he was clearly not listening when the officers told him he invoked his right to the sixth amendment due to his agitated demeanor, the officers' actions during this encounter were designed to spur on his agitated state, and the officers did nothing to actually ensure that he knowingly intended to waive his sixth amendment right. He argues he was prejudiced where his statements played a significant role in his convictions.

24

¶ 75 A criminal defendant has a constitutional right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. To determine whether counsel provided ineffective assistance, we look to the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). To prevail on a claim of ineffective assistance of counsel, "a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Cathey*, 2012 IL 111746, ¶ 23 (quoting *Strickland*, 466 U.S. at 694). The failure to establish either *Strickland* prong precludes an ineffective assistance of counsel claim. *People v. Cherry*, 2016 IL 118728, ¶ 31.

¶ 76 We need not address whether counsel's performance was objectively unreasonable, as defendant cannot establish prejudice. See *People v. Johnson*, 2021 IL 126291, ¶ 53 (a court may reject an ineffectiveness claim based on a lack of prejudice without considering whether counsel provided deficient representation). To establish prejudice, "defendant must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Valdez*, 2016 IL 119860, ¶ 29 (quoting *Strickland*, 466 U.S. at 694).

¶ 77 Defendant argues that, during his initial interview, his admission to using methamphetamine and its effect on his sexual performance, that he was in the area of Virginia's neighborhood, and that he stayed at Sims's home, all prejudiced his case. He contends that, during the execution of the warrant, his admission that his fingerprints might be on Virginia's tools was also prejudicial.

25

¶ 78    While we find these statements further supported the State's case, we cannot find defendant was prejudiced where the remaining evidence was overwhelming. See *People v. Nieves*, 192 Ill. 2d 487, 497 (2000) (prejudice prong of *Strickland* cannot be met in light of overwhelming evidence); *People v. Page*, 155 Ill. 2d 232, 266-67 (1993) (same). Virginia consistently identified defendant. Importantly, her testimony was corroborated by the DNA evidence, fingerprint evidence, and the state of her room. Defendant's DNA was included in the swabs of the bed, Virginia's cheek, and Virginia's neck. Male DNA was also present in Virginia's vaginal swab but there was not enough male DNA for further testing. Defendant's fingerprints were found on an interior storm door of Virginia's home and a lotion bottle which she indicated defendant touched during the home invasion and sexual assault. Moreover, during defendant's jail telephone calls, he also admitted to having taken some cash and other items from Virginia's home and that he must have dropped Sims's mail. Virginia's testimony regarding her previous encounter with defendant was also corroborated with testimony from law enforcement as well as her neighbor. Based on these facts, we find there is no reasonable probability defendant would have been acquitted had trial counsel successfully argued a motion to suppress. As such, defendant's ineffective assistance claim fails.

¶ 79                                        III. CONCLUSION

¶ 80    The trial court did not err in finding defendant was restored to fitness based on a stipulation to the proposed testimony of the mental health treatment team and the team's report, and defendant did not establish the necessary prejudice from counsel's failure to file a motion to suppress to sustain a ineffective assistance of counsel claim. Accordingly, we affirm.

¶ 81    Affirmed.